Gordon D. SEIGLE, Beth Anne Seigle, Thomas E. McGovern, Deloris V. McGovern, Stanley T. Keller, Anne M. Keller, Philip J. Sweeney, Jr., Martha H. Sweeney, Paul R. Armstrong, Estate of Ethel Armstrong, Deceased, Paul R. Armstrong, Executor, Cecil G. Church, and Anna K. Church, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 8083.

United States Court of Appeals Fourth Circuit.

Argued June 3, 1960.

Decided July 8, 1960.

Robert K. Eifler, Washington, D. C. (Seymour S. Mintz, William T. Plumb, Jr., Richard A. Mullens, and Hogan & Hartson, Washington, D. C., on brief), for petitioners.

Norman H. Wolfe, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and I. Henry Kutz, Attys., Dept. of Justice, Washington, D. C., on brief), for respondent.

Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.

SOPER, Circuit Judge.

This case relates to the computation of the cost of certain surplus aircraft propeller parts and accessories purchased by the taxpayers on July 1, 1952, for $300,000 and sold by them at a profit partly in the taxable period from July 1, 1952 to May 31, 1953, and partly in the taxable period from June 1, 1953 to October 31, 1953. No inventory of the goods sold was made as of the date of acquisition and the parties submitted different computations of the cost of the goods sold during the two taxable peri-

ods. The Tax Court rejected the computation offered by the taxpayers and held that the computation by the Commissioner was correct and this petition for review of its decision followed.

The goods purchased by the taxpayer had belonged to the Federal Government and were sold as surplus commodities by it to the Aircraft Components Corporation and by the latter to J. P. Kurtz & Company, a partnership doing business in Alexandria, Virginia, by which the individual taxpayers in the pending case were employed as key men. Prior to July 1, 1952, J. P. Kurtz & Company sold the goods to Aircraft Supplies, Inc., a New York corporation, and discontinued business. The contract of sale provided that if the purchaser disposed of the assets in bulk it would first offer them to the former key employees of the seller. These persons were Gordon D. Seigle and five other men, all of whom filed joint tax returns with their wives and with their wives are the appellants-taxpayers in this case.

On July 1, 1952, Seigle and his associates purchased the goods from Aircraft Supplies, Inc. for the sum of $300,000 (and the assumption of an obligation of the seller in the sum of $19,020.01) of which $50,000 was paid upon the execution of the agreement, and the balance of $250,000 was to be paid in monthly payments of $16,500 with interest. The balance due was secured by a promissory note of Seigle in the sum of $250,000 endorsed by his colleagues, and by the deposit of the capital stock of Specialties, Inc., which was owned by the taxpayers. The purchase price of the goods was fully paid by October 1, 1953. In the agreement it was stated that Aircraft Supplies, Inc. and J. P. Kurtz & Company had determined that the goods had a value of $300,000. None of the members of the purchasing firm had any control of the Kurtz firm or any interest of any kind in Aircraft Supplies, Inc. On the same day Seigle and his associates entered into a partnership under the name of Spartex & Company for the purpose of selling the purchased goods.

Seigle was a leading figure amongst the taxpayers and represented them in the purchase of the goods and he was very familiar with them. He had been engaged in buying and selling aircraft parts since 1946. From 1946 to 1950 he had been vice-president and sales manager of the Aircraft Components Corporation which originally purchased the goods from the United States, and from 1950 to the dissolution of J. P. Kurtz & Company he had been its sales manager.

In the period subsequent to July 1, 1952, Spartex disposed of the goods. During its first taxable period—from July 1, 1952 to May 31, 1953—its gross sales, exclusive of dealers' discounts in the sum of $79,000.00, amounted to $363,380.71; and during its second taxable period—from June 1 to October 31, 1953—its gross sales, exclusive of dealers' discounts, were $92,035.63.

In September 1953, the partners made a list of the items of the remaining assets and placed a value on them of approximately $750,000 based in part upon various manufacturers' list price sheets, some of them going back to 1942, and endeavored to sell them for a price ranging from $650,000 to $750,000, but were unsuccessful.

When October 31, 1953, arrived the taxpayers adopted a different plan for the disposition of the goods. They had paid the purchase price for them in full and, according to their testimony, did not desire to incur personal liability in the continuation of the business. Accordingly, they transferred all of their interests in Spartex to Specialties, Inc., of which they owned all of the stock, for the sum of $730,900. At that time they placed a valuation of $650,000 on the remaining assets. They received payment for their interests in Spartex, partially in cash and partially in promissory notes, and reported the gain from the sale to Specialties, Inc. as a long-term capital gain under the instalment method.

The present controversy arises with regard to the computation of the cost

of the goods in the Spartex partnership returns in the two taxable periods. It did not use the inventory method in computing the costs and did not allocate the cost of the goods on an item-to-item basis. Instead, it computed its costs at 66 per cent of the gross sales, which it asserted was the practice of the industry. Thus, for the first taxable period it took 66 per cent of its gross sales of $363,380.71 plus $79,000 dealer discounts, totaling $297,791.06, and added the obligation of $19,021.11 assumed by Spartex in the purchase agreement and arrived at a total cost of $310,991.07.

After taking deductions for business expenses, in the sum of $29,860.32, they reported a profit of $22,529.32.

In the taxable period ended October 31, 1953, the taxpayers, on the advice of an accountant, did not deduct any amount for the cost of goods sold. It reported gross receipts of $92,035.63 and, taking into account certain reworking costs in the amount of $10,903.04, it reported a gross profit of $81,132.59 and an adjusted net income of $70,449.07. The taxpayers' computations for the two taxable periods are shown in the tables in footnote 1.

1. The taxpayers' return for the first taxable period showed the following:

*July 1, 1952 to May 31, 1953*

| | | |
|---|---|---|
| Gross sales receipts | $363,380.71 | |
| Dealer discounts | 79,000.00 | |
| | $442,380.71 | |
| 66% of total | | $ 291,971.06 |
| Obligation with respect to materials sold within the period and for which the partnership was liable | | 19,020.01 |
| Cost of goods sold | | $ 310,991.07 |
| Gross sales receipts | $363,380.71 | |
| Cost of goods sold | 310,991.07 | |
| Gross profit | | $ 52,389.64 |
| Deductions | | 29,860.32 |
| Distributable Net Income | | $ 22,529.32 |

In the second taxable period, the taxpayers did not take any amount for cost of goods sold on the advice of the accountant. They deducted only actual expenses and reworking costs, thus:

*June 1, 1953 to October 31, 1953*

| | | |
|---|---|---|
| Gross sales receipts | | $ 92,035.63 |
| Cost of goods sold: | | |
| Initial inventory | $ 11,934.47 | |
| Reworking costs | 10,903.04 | |
| | $ 22,837.51 | |
| Final inventory | 11,934.47 | 10,903.04 |
| Gross profit | | $ 81,132.59 |
| Deductions | | 10,704.35 |
| Distributable Net Income | | $ 70,449.07 |

The Commissioner's computation followed a different method. He computed the total costs of the goods on July 1, 1952, and the total sales price of the

goods during the two taxable periods and found that the ratio of total costs to total sales was 30.2035 per cent; and he applied this cost ratio to the sales in each period. In computing the total costs, he added to the purchase price of $300,000 the obligation of $19,020.01 assumed by the purchaser under the contract, the reworking costs of $3,905.53 and $10,903.04 incurred in the two periods, and reached a total of $333,828.58. In computing the total sales price, he added to the gross sales of $363,380.71 in the first period and $92,035.63 in the second period the sum of $649,856.08, the valuation placed by the partners on the assets transferred to Specialties, Inc. and got a total sales price of $1,105,272.42. He then applied the cost ratio thus ascertained to the sales price of the goods, sold in the two taxable periods and ascertained a profit in the first period of $253,627.02 and a profit in the second period of $64,237.65, or a net increase in the gross profits of the two periods of $184,342.44. The Commissioner's calculation is shown in footnote 2.

2. (1) *Total sales price attributable to the entire assets:*

| | | |
|---|---:|---:|
| Gross sales to May 31 | $363,380.71 | |
| Gross sales to October 31 | 92,035.63 | |
| Valuation of remaining assets as of October 31 | 649,856.08 | $1,105,272.42 |

(2) *Costs of assets to partnership:*

| | | |
|---|---:|---:|
| Cost under contract | $300,000.00 | |
| Reworking and reconditioning costs to May 31, 1953 | 3,905.53 | |
| Obligations on material sold | 19,020.01 | |
| Reworking etc. to October 31 | 10,903.04 | $ 333,828.58 |

(3) *Cost ratio*

$$\frac{333,828.58}{1,105,272.42} = 30.2035\%$$

### July 1, 1952 to May 31, 1953

| | |
|---|---:|
| Gross sales receipts | $363,380.71 |
| Cost of goods sold ($363,380.71 x 30.2035%) | 109,753.69 |
| Gross profit | $253,627.02 |
| Deductions | 29,860.32 |
| Distributable Net Income | $223,756.70 |

### June 1, 1953 to October 31, 1953

| | |
|---|---:|
| Gross sales receipts | $ 92,035.63 |
| Cost of goods sold ($92,035.63 x 30.2035%) | 27,797.98 |
| Gross profit | $ 64,237.65 |
| Deductions | 10,704.35 |
| Distributable Net Income | $ 53,533.30 |

The Tax Court's argument in support of the Commissioner's method is based primarily on the finding that Spartex could have set up an opening inventory at cost as of July 1, 1952, and should have done so in order to comply with § 22(c) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 22(c) as explained in Regulation 118, § 39.22(c)–1, which requires that, in order to reflect net income correctly, inventories at the beginning and the end of each tax year

are necessary in every case in which the production, purchase, or sale of merchandise is an income producing factor. Since Spartex made no effort to meet this requirement the court held that the Commissioner was clothed with broad authority by § 41 of the Code, 26 U.S. C.A. § 41 to make such computation of net income as in his opinion does clearly reflect the income.

Our examination of the record convinces us that the basic finding cannot be sustained. At the trial of the case the taxpayers sought to introduce testimony that it was not practicable to allocate the cost of the bulk-lot stock of aircraft parts and assemblies purchased by Spartex among the innumerable items that composed it, and that it was impossible to construct an inventory of costs and thereby establish the cost basis of each sale subsequently made; but the Commissioner objected to the testimony on the ground that he was not contending that it was possible to make such an allocation or such an inventory, and the Tax Court indicated its understanding that the Government did not contend that such allocation could be made. Despite this attitude of the Commissioner and the Tax Court, some evidence on the subject of inventories got into the record, but all of it tended to show that inventories were impracticable and there was no testimony to the contrary.[3]

In this posture of the case the Tax Court's approval of the Commissioner's computation loses its force, especially as the Tax Court merely states its general conclusion and makes no attempt to demonstrate that the method is fair or to answer the criticisms directed against it. The Commissioner defends his computation in this court by contending that it is derived entirely from actual costs and actual sales by Spartex in the open market during the two tax periods and in the sale of the unsold products on October 31, 1953, by the partnership to Specialties, Inc., a corporation owned by the partners, for the sum of $730,900, a price established by themselves. This argument seems fair enough on its face, but it loses sight of the result which flows from the acceptance of the sales price of $730,900 as the value of the unsold goods at the end of the second tax period. It is obvious that there must have been a great increase in value during the two tax periods if all the goods bought for $300,000 at the beginning of the first period and the goods remaining at the end of the second period, after

3. Seigle testified in effect as follows. The assets comprised parts in numbers which varied from one to over one million in each of 1500 to 2000 differing item classifications; they range from screws, nuts, and bolts to propeller assemblies composed of hundreds of parts and weighing from six to eight hundred pounds. They were offered by the Government by listings of part numbers and quantity without further description. Most of them were boxed, wrapped, and covered with a thick layer of cosmoline gum so that only a small portion of the bulk lot was actually available for inspection before purchase. Taking a physical inventory of the assets would be prohibitively expensive, and at no time after its purchase from the Government was this lot actually so inspected. Only after an order was received were boxes opened to fulfill it, and until the boxes were opened the owners could have no idea of the condition of the parts they would find. Although each shipment was accompanied by a cardex file indicating its contents, these said nothing about the state of repair. Some of the parts which had never been opened from the time they had left the manufacturers' plant might be worth only salvage value because of deterioration; other parts had been used and might or might not be useable after repair. Further, the cardex cards were not always accurate.

Seigle had manufacturers' list prices available to him, or could determine the acquisition cost to the Government of all the parts, but the prices so ascertained were those charged when the parts were still being manufactured. In some instances these were the prices for parts which had been charged fifteen years earlier. They bore no relationship to the market conditions existing in 1952 or 1953.

**378**

substantial sales had been made, were sold for $730,900.[4]

The Commissioner's calculation, however, assumes that no change in the value of the goods took place between July 2, 1952 and October 31, 1953. This is true because it is based on the ratio between the cost and the sales price of all the goods, and hence the cost of goods sold at any time during the period cannot be ascertained without taking into account the price of the goods sold up to the very end of the period. In this instance, for example, the cost of goods sold in 1952 would be affected by the sum of $730,900 which Specialties, Inc. paid for the unsold goods on October 31, 1953. It is clear that in the application of the Commissioner's formula a change of values in the latter part of the tax period would necessarily distort the computation of the costs of goods previously sold.

Methods of computation of costs similar to that employed by the Commissioner in the pending case met with the disapproval of the courts in Taylor v. Commissioner, 2 Cir., 70 F.2d 619, and Kirkland v. Burnett, 61 App.D.C. 88, 57 F.2d 608. In each of these cases certain securities were acquired in bulk without allocation of costs among the several items which were later disposed of separately; and it was held to be error to assume that the real value of the various items remained constant and bore the same relation to each other when sold as they did when they were acquired. We think the same observations are relevant in the pending case.

■ It is not within our province to determine the method by which the cost of the goods should be computed in this case or to pass on the factual issues in which the case abounds. We merely point out, first, that there is no substan-

tial evidence to support the Tax Court's finding that it was possible to make inventories, but the taxpayers failed to make them, and hence the Tax Court was mistaken in concluding that the Commissioner was clothed with the broad authority conferred upon him by § 41 of the Revenue Code; and, two, that the Commissioner's computation is erroneous because it necessarily assumes, without proof, that no change in the value of the goods took place during the taxable periods. The Tax Court's order approving the Commissioner's determination must therefore be reversed.

■ We do not, however, hold that there is no substantial evidence to support the Tax Court's finding that the partnership's computation of costs at 66 per cent of the sales price is untenable. The record shows that Spartex's method was adopted upon the advice of expert accountants, who testified that dealers engaged in the sale of surplus aircraft parts customarily used a ratio of costs-to-gross sales of approximately 70 per cent as the result of their actual experience. They also testified that, in the absence of inventories and of experience in similar businesses, the proper method would be the recovery of all costs out of the sales first made and thereafter to treat all income as profit. The Tax Court, however, found that the partnership's goods had an unusual profit potential, and hence the experience of other concerns was not a proper guide to be followed under the unique circumstances of the pending case. The court pointed out that during the two tax periods sales amounting to $450,000 in the aggregate were made and that 70 per cent of this sum exceeded the original cost of $300,-000, leaving unsold goods on hand valued by the taxpayers at $650,000 on October 31, 1953, so that, if the taxpayers' meth-

4. In addition to the inference reasonably deducible from these matters, that the value of the goods had increased between July 1, 1952 and October 31, 1953, there was affirmative evidence that values had increased due to changes in Government policy which permitted repair work on

planes to be done by private industry and because of a reduction in the supply of surplus parts due to the Korean War, the extension of leases on Government planes, the increase in air travel and so forth.

od was consistently applied throughout, the cost calculated on a percentage basis would greatly exceed the actual cost which the taxpayers had incurred. There is substantial support for this position in the record. Accordingly, the case will be remanded to the Tax Court for new trial upon such evidence as the parties may offer.

Reversed and remanded.