CHARLES D. MISSIMER AND BETTY MISSIMER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; J. ARMSTRONG CROSS AND ESTATE OF JUDITH A. CROSS, DECEASED, J. ARMSTRONG CROSS AND KATHERINE A. BURKE, CO-EXECUTORS, and ESTATE OF RICHARD F. BURKE, DECEASED, KATHERINE A. BURKE, EXECUTRIX, AND KATHERINE A. BURKE, and KNOX L. CLARKE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Missimer v. Commissioner
Docket Nos. 6800-75, 7221-75.
United States Tax Court
T.C. Memo 1979-48; 1979 Tax Ct. Memo LEXIS 477; 38 T.C.M. (CCH) 192; T.C.M. (RIA) 79048; February 7, 1979, Filed *477 Certain of petitioners in docket No. 7221-75 transferred their controlling stock in a corporation to the petitioners in docket No. 6800-75. The sellers received $ 143,825 in cash from the buyer and the corporation transferred to the sellers real property and a building owned by it for $ 12,000 paid by the sellers to the corporation. The $ 12,000 was considerably less than the fair market value of the real property and building. Held, based on the transaction as a whole, the excess value of the real property and building over the sale price thereof was a constructive dividend to the buyer of the corporate stock. Gerald A. Dechow and Cordell M. Parvin, for petitioners in docket No. 6800-75. Frank W. Rogers, Jr. and Alton L. Knighton, Jr., for petitioners in docket No. 7221-75. Robert A. Johnson, for respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in petitioners' income tax as follows: Docket No.
Petitioner
Year
Deficiency
6800-75
Charles D. and
1972
$ 30,612.00
Betty Missimer
7221-75
1. Knox L. Clarke
1972
3,393.35
2. Estate of Richard
1972
6,026.20
F. Burke, deceased,
Katherine A. Burke,
Executor, and Katherine
A. Burke, surviving
spouse
3. Estate of Judith A.
1972
6,985.47
Cross, deceased, J.
Armstrong Cross and
Katherine A. Burke,
co-executors, and J.
Armstrong Cross,
surviving spouse
The only issue for resolution is whether the sale of corporate-owned real property by the corporation for less than its fair market value to the sellers of the controlling interest in the corporation on the same day as the sale of the controlling stock interest *479 to a minority stockholder is a constructive dividend to the sellers of the controlling interest or to the buyer. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner J. Armstrong Cross is the surviving spouse of Judith A. Cross. J. Armstrong Cross and Katherine A. Burke are the coexecutors of the estate of Judith A. Cross. At the time the petition was filed, J. Armstrong Cross resided in Salem, Va. The Crosses filed a joint income tax return for 1972 with the Office of Internal Revenue Service at Memphis, Tenn. Petitioner Katherine A. Burke is the surviving spouse of Richard F. Burke, who died during 1972. Katherine A. Burke is the executrix of the estate of Richard F. Burke. At the time the petition was filed, Katherine A. Burke resided in Salem, Va. The Burkes' joint income tax return for 1972 was filed with the Office of Internal Revenue Service at Memphis, Tenn. Petitioner Knox L. Clarke resided in Salem, Va., at the time the petition was filed. Her income tax return for 1972 was filed with the Office of Internal Revenue Service at Memphis, Tenn. Petitioners Charles D. Missimer and Betty Missimer resided in Roanoke, Va., at *480 the time their petition was filed. Their joint income tax return for 1972 was filed with the Office of Internal Revenue Service at Memphis, Tenn.
Albert Brothers Contractors, Inc. (hereinafter the corporation), is a road building and heavy grading company which was founded by the father of Katherine A. Burke (hereinafter Burke) and Judith A. Cross (hereinafter (Judith), and the adopting father of Knox L. Clarke (hereinafter Clarke). Immediately prior to May 19, 1972, 966 shares of common stock of the corporation were outstanding. Of the 966 shares, Burke owned 190 shares, Clarke owned 126 shares, Judith owned 190 shares, and J. Armstrong Cross owned 17 shares. Burke, Clarke, and Judith (hereinafter referred to collectively as the sisters) had owned their stock since inheriting it from their father in 1951. The sisters were members of the board of directors. Burke worked for the corporation for part of 1971 and 1972, but otherwise the sisters were not active in the actual operation of the corporation during the taxable year at issue. Charles D. Missimer (hereinafter Missimer), who had been an officer and director of the corporation for some time, owned 72 shares of the corporation. *481 Missimer had acquired these shares in 1970 as a gift from his father, Linc Missimer, who was president and general manager. [1]
In early 1972 a disagreement arose between the sisters and the Missimers over dividend policy. The sisters discussed with their attorney, John Thornton, the possibility of liquidating the corporation or selling their stock. Thornton did not favor liquidation and suggested that the sisters sell their stock. Missimer was interested in purchasing the stock. In April and May of 1972 serious negotiations were commenced by the sisters and Missimer concerning Missimer's acquisition of the sisters' stock in the corporation. Missimer originally proposed acquiring enough of the sisters' stock to control the corporation, but the sisters would sell all of their stock or none of it. The book value of the stock was approximately $ 500 *482 per share. The sisters set a minimum price of $ 350 to $ 375 per share for the stock. Missimer, however, offered only $ 275 per share. Negotiations came to a standstill. At that point in the negotiations, Elaine Vaughn, bookkeeper and secretary of the corporation, suggested that the sisters acquire the building in which the corporation operated and the land on which the building stood and on which equipment was stored. This would assure them of receiving full value for their stock as well as a steady income. The sisters were agreeable to this suggestion. Missimer at first declined to consider the proposal but changed his mind upon reflection that the corporation did not require ownership of the building and property in order to conduct its operations and a leaseback from the sisters would provide the corporation with income tax deductions. The fair market value of the real property was $ 76,101. [2] Apparently, the depreciated value of the property on the books was approximately $ 12,000. *483 Once this tentative agreement was reached, Thornton suggested that the transactions be structured as a sale of 393 shares to Missimer for $ 143,825 followed by a purchase of the real property for $ 11,562 and the delivery to the corporation for redemption of 130 shares of stock. Although this form was agreeable to the sisters, Missimer objected to it and it was abandoned. Consequently, on May 19, 1972, the following transactions occurred. The sisters and Cross transferred to Missimer all of their shares of stock for $ 143,825 cash. Broken down, Burke received $ 52,250, Clarke received $ 34,650, Judith received $ 52,250, and Cross received $ 4,675. The sisters and Cross resigned as directors of the corporation and Linc Missimer, Charles Missimer, and Robert Buchanan were elected as the directors of the corporation. The new directors thereupon adopted a resolution authorizing the sale of the land and building to the sisters for $ 12,000. The sisters then paid the corporation $ 12,000, upon receipt of which the corporation transferred to them by deed a parcel of land located in Salem, Va., and described as Lots 1 through 16, Section 26, Salem Improvement Co., and the building *484 thereon (hereinafter referred to as the building or the property). Conveyance of the building was done after Missimer had acquired the stock and he and his designees were members of the board of directors that authorized the sale of the property for $ 12,000. Thereupon the sisters and the corporation executed a lease agreement whereby the sisters leased the real property to the corporation at a rental charge of $ 900 per month for a term of 5 years, with the corporation having an option to renew the lease for an additional 5 years at a rental charge to be renegotiated. Neither the sisters nor Cross at any time agreed to transfer all of their stock to Missimer solely in return for the $ 143,825 payment from Missimer, and they did not agree to make the stock transfer without the contemporaneous transfer of the real property to them. The sisters would not have sold their stock for $ 275 per share alone. The balance sheet of the corporation reflected retained earnings of $ 442,498 as of December 31, 1971. Nothing occurred between that date and May 19, 1972, which reduced this amount. In the notice of deficiency mailed to Missimer on July 14, 1975, respondent determined that *485 the "bargain sale of corporately owned property was in lieu of cash and/or consideration for the Albert Sisters' stock. Therefore, the excess fair market value of $ 64,101 constitutes a constructive dividend to Charles D. Missimer." In the notices of deficiency mailed to the other petitioners respondent determined that "the excess value of said real estate over the cash paid is a bargain purchase from the corporation * * * which constitutes constructive dividend income to the shareholders." It is stipulated that the only issue being contested by the petitioners is whether the transfer of the real property was a constructive dividend and, if so, who received that dividend. OPINION Respondent, who is essentially a stakeholder in this action, has determined that the acquisition by the sisters of the corporation's real property and building for less than its fair market value was a constructive dividend to the extent the fair market value thereof exceeded the purchase price of the property. At the trial and on brief neither group of petitioners quarrel with this determination. They do quarrel, however, over whether the dividend was received by the sisters or by Missimer. *486 We find that under the circumstances of this case the difference between the fair market value of the property and the price paid therefor could be determined to be a constructive dividend to either the sellers or the purchaser. It is clear from the evidence that the sale of the stock and the acquisition of the building by the sisters were both integral parts of the same transaction; neither would have taken place unless both were consummated. As pointed out in Century Electric Co. v. Commissioner, 15 T.C. 581, 592 (1950), an integrated transaction should not be separated into its component parts for tax purposes. The tax consequences of the transaction must depend on what actually was intended and accomplished rather than on the separate steps taken to reach the desired end. And since both transfers were consummated at the one closing meeting, we do not give too much weight to the sequence of events, except as hereinafter mentioned. Section 316(a), I.R.C. *487 1954, [3] provides, in part, that a dividend is any distribution of property made by a corporation to its shareholders out of its earnings and profits. While technically speaking the sisters may not have been stockholders at the time the property was transferred to them, the transfer of the real estate to them was an agreed-upon fact prior to the closing and they could have exercised their control as stockholders to cause the corporation to transfer the property to them for less than its value. Such has been recognized as giving rise to a constructive dividend to the selling shareholders. West v. Commissioner, 37 T.C. 684 (1962). On the other hand, payment by a corporation of a part of the purchase price of property acquired by a stockholder in his own name has been held to result in a constructive dividend to the buyer. Lacy v. Commissioner, 341 F. 2d 54 (10th Cir. 1965). Since petitioners do not dispute that the sale of the real estate for *488 less than its fair market value gave rise to a constructive dividend to either the buyer or the sellers, the only question for us to decide is which group received the dividend. Respondent takes the position in his brief that since the facts as to who received the dividend are unclear he will rest on his alternative positions. We agree with respondent that there is a definite conflict in the evidence presented, but the Court must "bite the bullet" and decide the issue. In doing so, we keep in mind the maxim that in tax matters the economic substance of a transaction will usually prevail over its form. Commissioner v. Cort Holding Co.,324 U.S. 331 (1945). We have no magic formula to decide this issue; it is a question of whose version of the transaction we find most realistic and convincing, which is a factual conclusion. If the sisters agreed to sell their stock to Missimer for $ 143,825 cash and the building, and the building was conveyed to the sisters as part of the purchase price, there was a constructive dividend to Missimer. Christensen v. Commissioner, 33 T.C. 500, 506 (1959). *489 But if, as claimed by Missimer, he agreed to buy all 523 shares of stock of the sisters and Cross for $ 275 per share, and the sisters, as majority stockholders, caused the corporation to sell them the building for less than its fair market value, there was a constructive dividend to the sisters. Coffey v. Commissioner,14 T.C. 1410, 1417 (1950). Although the record is not as complete as we would like, [4] in our opinion the sisters' version of the transaction is more convincing than Missimer's. The only evidence presented, in addition to the stipulated facts, was the testimony of Burke and Missimer, and two letters written by Thronton, the sisters' attorney, several days before the transaction was finalized. The May 12 letter of Thornton, addressed to all of the directors of the corporation, outlined the procedure to be followed at the closing if Thornton's plan was agreed upon but, as heretofore noted, his plan was not agreed to by Missimer. For some reason, there was no written memorandum of the transaction in its final form. *490 As we analyze the situation, Missimer was most anxious to gain control of the corporation. He apparently was the managing officer of the business and thought it prudent to retain the earnings of the business in the corporation. On the other hand the sisters, who were the controlling stockholders but were not salaried employees of the corporation, insisted on the corporation paying out its earnings in dividends. So Missimer opened negotiations to acquire controlling interest in the corporation from the sisters. Missimer first offered to pay $ 150 to $ 200 per share for the sisters' stock (including Crosses' 17 shares) and finally offered a maximum of $ 275 per share, which he testified was all he could afford to pay. But the sisters would not sell for less than $ 350 to $ 375 per share, the stock having a book value of about $ 500 per share. To break the impass, it was suggested that the building be transferred to the sisters to sweeten the pot and provide them with a source of income. Thornton suggested that the sisters and Cross sell 393 shares of their stock to Missimer for $ 143,825 (which was the total Missimer would have had to pay for all 523 shares at $ 275 per share), *491 and that the corporation sell the building to the sisters in exchange for the remaining 130 shares of their stock and about $ 12,000 cash. e8It is unclear how or why the $ 12,000 came into the picture but that apparently was about the book value of the building on the books of the corporation.) Missimer would not agree to this so the final form in which the transaction was cast was for the sisters and Cross to transfer all 523 shares of their stock to Missimer and then resign as directors of the corporation, Missimer was to give them a check for $ 143,825, and the newly elected directors were to authorize the corporation to sell the building to the sisters for $ 12,000; and that is the form in which the transaction was carried out. As a result of the transaction, all of the individuals received about what they wanted. Missimer acquired all 523 shares of the sisters' stock, thereby eliminating them as dissident shareholders and giving him control of the corporation, for a cash outlay of $ 143,825. Cross received $ 4,675 cash for his shares. The sisters received $ 139,150 in cash and the building for a cash out-lay of $ 12,000, the net of which (when the assumed excess of the *492 fair market value of the building over what they paid is taken into consideration) gave them a value received of about the $ 350 to $ 375 per share they insisted on receiving for their stock. The only participant in the transaction that did not fare so well was the corporation, which transferred a property worth $ 76,000 for $ 12,000. Missimer claims that he paid $ 275 per share for the 523 shares of stock of the corporation with the building eliminated as a corporate asset. However, there is no evidence that at any time during the negotiations he made such an offer or that it was accepted by the sisters. Missimer was also the only net beneficiary of the arrangement whereby the corporation transferred the building to the sisters for less than its fair market value. The value of the building added to the cash they received only gave the sisters their asking price for their stock. On the other hand, Missimer acquired all 523 shares of the stock for just $ 275 per share, which he could not have done without having the building thrown in to the purchase price. Of course, the corporation's assets were decreased by the value of the building, but its book value probably still exceeded *493 $ 375 per share. Missimer also became the owner of about two-thirds of the outstanding stock of the corporation instead of only slightly more than the 55 percent had he acquired only 393 shares. And finally, it was Missimer and his nominees on the board of directors who actually adopted a resolution authorizing the sale of the building to the sisters for $ 12,000. Missimer could control the board only after he acquired the sisters' stock. This clearly suggests that Missimer had the corporation carry out a part of his obligation to the sisters incurred in connection with his acquisition of their stock. This could be accomplished only with the acquiescence of the non-participating stockholders who were friendly to Missimer. There are other factors that would support the sisters' version of the transaction as well as some that would support Missimer's version. But on balance, we have concluded that the weight of the evidence and circumstances favors the conclusion that the excess value of the building was part payment for the stock Missimer acquired in his own name and that he was, in fact, the beneficiary of the corporate action. He was therefore the recipient of a constructive *494 dividend from the corporation in the amount of $ 64,101. Both parties rely on cases which seem to support their arguments. However, on an issue such as this each case must be decided on its own facts and circumstances, and other cases are not conclusive. The petitioners-sisters rely principally on Christensen v. Commissioner,supra;Lacy v. Commissioner,supra;Stephens v. Commissioner,60 T.C. 1004 (1973), affd. 506 F. 2d 1400 (6th Cir. 1974); and Glenn-Minnich Clothing co., Inc. v. Commissioner,T.C. Memo. 1960-207. In each of those cases the Court found that the purchaser of corporate stock had caused the corporation to apply certain of its assets to the purchaser's obligations under the agreement for purchase of the stock, and that this gave rise to a taxable dividend to the purchaser. On the other hand, petitioners Missimer rely principally on Gilmore v. Commissioner,25 T.C. 1321 (1956); Coffey v. Commissioner,supra; and West v. Commissioner,supra, all being cases in which the Court concluded that the assets received *495 from the corporation by the sellers were not part of the sale price of the stock but were dividends to the sellers. In Gilmore and Coffey, however, the agreements entered into by the buyers and sellers spelled out what the purchase price of the stock would be and provided separately for distribution of certain corporate assets to the sellers. That was not done in the instant case; there was no agreement on the purchase price until it was agreed that the sisters could buy the building for less than its fair market value. And in Coffey, the Court found it "quite significant" that the sellers did not transfer their stock until a resolution was adopted by the directors of the corporation authorizing the transfer of certain corporate assets to the sellers. Here, such a resolution was adopted after the stock was transferred by the new board of directors. In West the sellers received a tax refund due the corporation after their stock had been transferred. However, the Court found that the value of the refund had been eliminated as an asset of the corporation in negotiating the sales price of the stock. In our case Missimer testified that he had offered to pay $ 275 per share *496 for the stock with the building eliminated as an asset of the corporation. But so far as we can determine from the record his "final" offer for the stock was $ 275 per share before transfer of the building was ever discussed. Burke testified that the sisters agreed to take the building as part of their selling price of $ 365 - $ 375 per share. In each of the above opinions it is clear that the Court was struggling to determine from all the evidence before it just what the actual transaction between the parties was--and the tax consequences evolved from that conclusion. We have done the same thing here and have concluded that the transaction as finally agreed upon by the parties placed an obligation on Missimer to pay the sellers $ 143,825 in cash and cause the corporation to transfer the building to the sisters in exchange for the 523 shares of stock. The transfer of the building was therefore in partial satisfaction of Missimer's obligation, and he was the one who benefited therefrom. Decision will be entered for respondent in docket No. 6800-75. Decision will be entered under Rule 155 in docket No. 7221-75. Footnotes
1. The remaining 371 shares were owned by Robert Buchanan, J. Abernathy, W. D. Beasley, L. B. Albert, and Linc Missimer. Prior to May 19, 1972, the board of directors of the corporation was comprised of the three sisters, J. Armstrong Cross, Linc Missimer, Charles Missimer, Buchanan, and Abernathy, as long as he was active.↩
2. This figure was stipulated. The sisters reported a total of $ 45,045 in addition to their shares of the cash received as the selling price of the stock on their 1972 returns. Presumably the $ 45,045 represented what they thought to be the fair market value of the property at the time of the sale.↩
3. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
4. We gather from the record that Linc Missimer, Robert Buchanan, Judith Cross, and John Thornton were all deceased at the time of the trial. Charles Missimer apparently had no counsel representing him in the negotiations or at least at the closing.↩