HARRY T. MANGURIAN, JR. and DOROTHY J. MANGURIAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DREXEL PROPERTIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mangurian v. Commissioner
Docket Nos. 3709-75, 3710-75.
United States Tax Court
T.C. Memo 1979-91; 1979 Tax Ct. Memo LEXIS 442; 38 T.C.M. (CCH) 366; T.C.M. (RIA) 79091; March 15, 1979, Filed *442 Petitioner organized a corporation to develop residential property in Florida. In the case of the cooperative apartment developments, petitioner acquired the land, obtained the required financing and entered into a 99-year ground lease with the corporation. The corporation undertook to construct and sell the units, subject to the ground lease. In the case of the condominium apartment developments, petitioner sold part of the land to the corporation for a cash consideration. Petitioner thereupon erected so-called "recreational facilities" on the remainder of the land. Petitioner entered into a 99-year recreational lease with the corporation predicated on the total value of the land, including that portion already sold to the corporation. Held: (1) The proportionate obligation for the ground lease or recreational facilities lease assumed by the purchasers of the individual units was not a part of the consideration received by the corporation for the sale of the units. Neither the corporation nor the petitioner is taxable on the capitalized value of such rentals. Lakeside Garden Developers, Inc. v. Commissioner,T.C. Memo 1976-290, on appeal to the 5th *443 Circuit. (2) The cost incurred by the corporation in the acquisition of the land and construction of the building is not allocable in part to the 99-year ground lease or recreational lease held by the petitioner. Welsh Homes, Inc. v. Commissioner,32 T.C. 239 (1959), affd. 279 F.2d 391 (4th Cir. 1960) distinguished. (3) The cash received by petitioner for the sale of the land on which the condominium apartments were erected, the value of which was also taken into account in the determination of the rentals to be paid under the 99-year lease of the recreational facilities, resulted in a distribution by the corporation to the petitioner with respect to its stock, taxable as a dividend to the extent of the earnings and profits. Such amount is further excluded in computing the cost or basis of the property for the purpose of determining gain or loss by the corporation on the sale of the individual units. J. Ernest Brophy and Brian C. Deuschle, for the petitioners. William R. McCants, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined deficiencies in income taxes due from Harry T. Mangurian, Jr., and Dorothy J. Mangurian for the taxable years 1967 to 1971, inclusive as follows: (cents omitted) Calendar
Notice of
Amended
Second Amended Year
Deficiency
Answer
Answer
12-31-67 $ 460,210 $ 316,516 $ 200,223
12-31-68
441,275
234,987
150,813
12-31-69
386,287
351,504
352,281
12-31-70
868,088
764,683
760,889
12-31-71
1,239,495
1,135,371
1,131,217
*445 Respondent determined deficiencies in income taxes due from Drexel Properties, Inc., for the fiscal years ending September 30, 1967, to 1971, inclusive, in the following amounts: (cents omitted) Fiscal
Notice of
Amended
Second Amended Year
Deficiency
Answer
Answer
1967
$440,636
$130,935
$ 28,965
1968
680,598
223,243
52,623
1969
168,959
90,355
81,741
1970
486,396
233,286
228,100
1971
530,719
274,414
270,690
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. At the time of the filing of the petition herein, Harry T. Mangurian, Jr., and Dorothy J. Mangurian resided in Fort Lauderdale, Florida. They filed their joint Federal income tax returns for the calendar year 1967 with the Director, Internal Revenue Service Center, Andover, Massachusetts, and for the years 1968 through 1971, inclusive, with the Director, Southeast Service Center, Internal Revenue Service, Chamblee, Georgia. [2]
*446 Drexel Properties was incorporated on January 19, 1965, under the name of Cypress Sixty-Two, Inc. The corporate name was changed March 31, 1965, to Georgian Court Apartments, Inc., on August 8, 1966, to Georgian Court Corporation, and finally on September 16, 1968, to Drexel Properties, Inc. Drexel Properties filed corporate tax returns for the taxable year ended September 30, 1967, with the District Director, Internal Revenue Service, Jacksonville, Florida, and with the Director, Atlanta Service Center, Chamblee, Georgia, for the years ended September 30, 1968, through September 30, 1971. At the time of its incorporation, petitioner paid $500.00 to Drexel Properties for the total 100 shares of authorized common stock, carried on the books and records of Drexel Properties at the value of $500.00 during the years in issue. In addition, petitioner contributed $2,500.00 to the paid-in capital of Drexel Properties. Petitioner owned 100 percent of the stock of Drexel Properties during the years in issue. Drexel Construction Company was incorporated under the laws of the State of Florida on September 23, 1966. Drexel Construction Company was involved in the construction of *447 real estate improvements for Drexel Properties. Petitioner controlled Drexel Construction Company during the years in issue. The tax liabilities of Drexel Construction Company are not in issue.
Beginning in approximately 1965 and continuing through the years in issue, petitioner and Drexel Properties were involved in certain real estate transactions and developments. These real estate developments involved both cooperatives and condominiums. The developments, in chronological order, were known under the following names: (1) Georgian Court South, also known as Georgian Court Apartments and as Georgian Court Phase I; (2) Georgian Court North, also known as Georgian Court Phase II; (3) Virginian Cooperative Apartments, also known as Virginian Apartments of Pompano Beach, and Virginian Apartments; (4) Imperial Point Colonnades; and (5) Imperial Point Gardens The Georgian Court South development was comprised of six buildings, each of which contained 24 apartments. On March 25, 1965, the petitioner acquired two contiguous properties totaling 8 acres for a total consideration of $251,624. Petitioner planned to divide the acreage equally between the Georgian Court South *448 development and the Georgian Court North development. The construction in the Georgian Court South development was performed by September Corporation, a construction company owned by petitioner's brother. Drexel Properties constructed the units on Georgian Court North. Drexel Properties developed both the South and the North complex. On October 29, 1965, building permits were secured for the construction of Georgian Court South. At that time Drexel Properties had a nominal capitalization. The funds to finance the construction of the cooperative developments initially came directly from petitioner. After the initial advances, the incoming deposits from purchasers financed the on-going construction costs. In this way the interest expenses were minimized. As of September 30, 1967, construction of Georgian Court South had been completed and the 144 apartment units in Georgian Court South had been sold for a total of $1,193,511. The cost of construction of these units was $843,288. Drexel Properties realized a gross profit of $350,223 from the sale of the units. On January 3, 1966, petitioner and Drexel Properties entered into a lease whereby petitioner leased the four acres *449 on which the Georgian Court South apartments were being built to Drexel Properties for an annual rental of $60,000, to be paid monthly beginning October 1, 1966. Georgian Court South Apartments, Inc., a cooperative association, was formed by Drexel Properties, with petitioner as president. On August 31, 1967, the lease for the ground rent of $60,000 was assigned to the cooperative association as lessee. The first payment under the lease was made in September 1967. On November 1, 1967, control of the association was turned over to the purchasers of the individual apartments. As of November 1, 1965, the date of commencement of construction, the fair market value of the 4 acres dedicated to the construction of Georgian Court South was $160,000. The lease between petitioner and Drexel Properties on January 3, 1966, did not serve materially to enhance that value. As of August 31, 1967, when the lease was assigned to the Georgian Court South cooperative association, the value of the property subject to the lease was dependent upon the sale of the individual units making up the Georgian Court South complex. For purposes of sale as an income producing asset, such leasehold had no fair *450 market value until at least 50 percent of the units were sold.
Upon the sale of all of the units making up the complex, when it became apparent that Georgian Court South cooperative association would be able to meet the payments due under the leasehold on a continuing basis, the leasehold could be sold as an income-producing asset for as much as $600,000, the ultimate amount depending upon the market price for alternate sources of income at that time. The Georgian Court North development was constructed on the remaining 4 acres acquired by petitioner on March 25, 1965. The development likewise was comprised of six buildings, each of which contained 24 apartments. On November 30, 1966, building permits were requested for the construction of Georgian Court North. Construction was undertaken by Drexel Construction Company, a corporation organized and controlled by petitioner. The funds to finance the construction of the cooperative developments initially came directly from petitioner. After the initial advances, the incoming deposits from purchasers financed the on-going construction costs. In this way the interest expenses were minimized. On August 1, 1967, petitioner and *451 Drexel Properties entered into a lease whereby petitioner leased the 4 acres on which the Georgian Court North Apartments were being built to Drexel Properties for an annual rental of $60,000, payable beginning August 1, 1967. The Georgian Court North Apartments, Inc., a cooperative association, was formed by Drexel Properties, with petitioner as president. On May 28, 1968, the lease was assigned to the cooperative association, which assumed the obligation to pay the rent. The first payment under the lease was made in June 1968. On or before September 30, 1967, 29 apartments in the Georgian Court North development had been sold for a total of $265,960. During the year ending September 30, 1968, the remaining 115 apartments were sold for a total of $1,019,100. The sale of the 144 units thus produced a gross sales income of $1,285,060. The cost of construction of these units was $726,247. Drexel Properties thereby realized a gross profit of $558,813 on the sale of the units. As of December 8, 1966, the date of commencement of construction, the fair market value of the 4 acres dedicated to the construction of Georgian Court North was $200,000. The lease between petitioner and *452 Drexel Properties on August 1, 1967, did not serve materially to enhance that value. For purposes of sale as an income-producing asset, such leasehold had no ascertainable fair market value until at least 50 percent of the units were sold. As of May 28, 1968, when the lease was assigned to the Georgian Court North cooperative association, the value of the property subject to the lease was dependent upon the sale of the individual units making up the Georgian Court North complex. More than 50 percent of the units had been sold at that time. Upon the sale of all of the units making up the Georgian Court North complex, when it became apparent that the Georgian Court North cooperative association would be able to make the payments due under the lease on a continuing basis, the leasehold could be sold as an income-producing asset for as much as $600,000, the ultimate amount depending upon the market price for alternate sources of income at that time. The Virginian Apartments is the third cooperative apartment project involved in this proceeding. On or about November 1, 1966, petitioner acquired 4.517 acres of land to be used for the construction of these units. The project comprised *453 139 apartments. On August 10, 1967, building permits were secured for the construction of the Virginian Apartments. The construction was undertaken by Drexel Construction Company. The funds to finance the construction of the cooperative developments initially came directly from petitioner. After the initial advances, the incoming deposits from purchasers financed the on-going construction costs.In this way the interest expenses were minimized. On December 1, 1967, petitioner and Drexel Properties entered into an agreement whereby petitioner leased the 4.517 acres underlying the development to Drexel Properties for an annual rental of $60,429, the first payment being due May 1, 1968. The Virginian Apartments, Inc., a cooperative association, was formed by Drexel Properties, with petitioner as president. On December 30, 1968, the lease was assigned to the association. As of the date of this assignment, the value of the property subject to the lease was dependent upon the sale of the individual units making up the Virginian complex. For purposes of sale as an income-producing asset, such leasehold had no ascertainable fair market value until at least 50 percent of the units were *454 sold. The first payment of rent was made on January 1, 1969. During the fiscal year ended September 30, 1968, 126 apartments in the Virginian project were sold for a total of $1,420,523. During the fiscal year ended September 30, 1969, the remaining 13 units were sold for a total of $147,688. Sale of the 139 units resulted in a gross sales income of $1,568,211. The cost of construction amounted to $1,221,315. Drexel Properties thereby realized a gross profit of $346,896. As of October 19, 1967, the date of commencement of construction, the fair market value of the 4.517 acres dedicated to the construction of the Virginian Apartments was $190,000. The lease between petitioner and Drexel Properties executed December 1, 1967, did not serve materially to enhance that value. On or before September 30, 1969, when the 139 units had been sold, and it became apparent that the Virginian Apartments cooperative association would be able to make the payments due under the lease on a continuing basis, the leasehold could be sold as an income-producing asset for as much as $600,000, the ultimate amount depending in part on the market for other income-producing properties at that time. *455 [3]
On or about December 15, 1967, petitioner purchased 19.2 acres of land for the purpose of constructing the Imperial Point Colonnades complex. This complex consisted of 23 buildings, each containing 24 units and is the first of the condominium projects involved in this proceeding. On January 15, 1969, petitioner sold 17.54 of the total of 19.2 acres to Drexel Properties for a stated consideration of $629,101, receiving an unsecured note from Drexel Properties payable on November 1, 1972, with interest at 6 percent. Building permits were secured for the construction of the buildings on various dates between May 20, 1968, and May 27, 1969. The buildings were constructed by Drexel Construction Company. Certificates of occupancy were issued at various dates between April 1, 1969, and May 18, 1972. On February 1, 1969, petitioner and Drexel Properties entered into an agreement whereby petitioner leased the remaining 1.66 acres to Drexel Properties for an annual rental of $327,888. Drexel Properties constructed recreational facilities on this site at *456 a cost of $238,500. The annual rental of $327,888 for the 1.66 acres on which the recreational facilities were built was predicated on the cost or value of the 19.2 acres, notwithstanding that 17.54 acres were sold to Drexel Properties for a stated consideration of $629,000. On January 9, 1969, Imperial Point Colonnades, Inc., a condominium association, was formed by Drexel Properties, with petitioner as president of the association. Thereupon, the condominium association assumed the obligations under the lease of the recreational facilities. On December 1, 1971, control of the condominium association was turned over to the purchasers of the individual apartment units. The first payment under the lease was made on August 1, 1969. The following schedule sets forth the sales income, cost of units sold and gross profit realized by Drexel Properties from the sale of the Imperial Point Colonnades apartments: Imperial Point Colonnades
Sales
Cost of Sales
Gross Profit
9/30/69 $ 913,490 $ 606,380 $ 307,110
9/30/70
2,890,130
1,918,508
971,622
9/30/71
2,518,910
1,807,807
711,103
9/30/72
4,565,020
3,112,840
1,452,180
9/30/73
95,850
65,709
30,141
$10,983,400
$ 7,511,244
$ 3,472,156
*457 As of June 11, 1968, the date of commencement of construction, the fair market value of the 19.2 acres dedicated to the construction of the Imperial Point Colonnades was $900,000. As of September 30, 1969, the obligation of Drexel Properties to pay $629,000 for 17.54 of the acres depended upon the successful development of the project. Only 51 units had been sold. The leasehold obligation for the recreational facilities had no fair market value. As of September 30, 1973, with the successful "sell out" of the project, the leasehold could be sold as an income-producing asset for as much as 10 times the annual rental as of that date. The annual rental as adjusted pursuant to the lease was $382,300. Inclusive of the obligation for the payment of $629,000 on account of the acreage sold for construction of the condominimum apartments, the fair market value of the total consideration ultimately received by petitioner from this project was $4,452,000, resulting in an economic gain of $3,552,000, computed, as follows: Value of recreational
lease
$ 3,823,000
Sale of land for
condominium
629,000
$ 4,452,000
Less: Value of land
contributed
900,000
Economic gain
$ 3,552,000
*458 The Imperial Point Gardens is the second condominium apartment project involved in this proceeding. On or about January 23, 1968, petitioner acquired approximately 4.132 acres of land for the project plus eight lots at a cost of $299,327.75. On August 12, 1969, building permits were secured for the construction of the Imperial Point Gardens. Certificates of occupancy were issued on various dates between June 26, 1970, and January 25, 1971. The construction was undertaken by Drexel Construction Company. Drexel Properties was the developer of the project. The ultimate cost to Drexel Properties was $2,037,598. On October 20, 1969, petitioner sold approximately 3.92 acres to Drexel Properties for a stated consideration of $214,074, receiving an unsecured note from Drexel Properties payable on November 1, 1973, with interest at 6 percent. On July 8, 1970, petitioner leased to Drexel Properties the remaining land (approximately. 212 acres) for 99 years for an annual rental of $76,320. Drexel Properties constructed recreational facilities on the leased land at a cost of $107,500. The annual rental of $ 76,320 for the .212 acres on which the recreational facilities were built *459 was predicated on the cost or value of the 4.132 acres, notwithstanding that 3.92 acres were sold to Drexel Properties for $214,074. On September 15, 1969, the Imperial Point Gardens Condominium, Inc., was formed by Drexel Properties, with petitioner as president. The lease was thereafter assumed by the condominium association. On September 1, 1971, control of the condominium association was turned over to the purchasers of the individual apartment units. The first payment under the lease was made on October 6, 1970. The Imperial Point Gardens comprised 160 units. During the year ending September 30, 1970, 32 units were sold. During the year ending September 30, 1971, a total of 147 units had been sold. The remaining units were sold in the subsequent year. The following schedule sets forth the sales income, cost of units sold, and gross profit realized by Drexel Properties from the sale of the Imperial Point Gardens apartments: Imperial Point Gardens
Sales
Cost of Sales
Gross Profit
9/30/70 $ 603,880 $ 358,734 $ 245,146
9/30/71
2,340,670
1,487,480
853,190
9/30/72
287,280
191,384
95,896
$ 3,231,830
$ 2,037,598
$ 1,194,232
*460 As of October 20, 1969, the date of commencement of construction, the fair market value of the 4.132 acres was $320,000. As of September 30, 1970, when 32 of the 160 units had been sold, the fair market value of the leasehold did not exceed the value of the underlying land. As of September 30, 1972, when the total of 160 units had been sold, and it became apparent that the condominium association would be able to make the payments due under the lease on a continuing basis, the leasehold could be sold as an income-producing asset for as much as $763,000. Inclusive of the obligation for the payment of $214,074 on account of the acreage sold for construction of the condominium apartments, the fair market value of the total consideration ultimately realized by petitioner from this project was $985,000, resulting in an economic gain of $657,000, computed, as follows: Value of recreational
lease
$ 763,000
Sale of land for
condominium
214,000
$ 977,000
Less: Value of land
contributed
320,000
Economic gain
$ 657,000
The condominium form of development was selected for Imperial Point Colonnades and Imperial Point Gardens due to the fact that the institutional *461 lenders were no longer willing to finance the individual purchasers of the apartment units unless an allocable interest in the underlying land was acquired by such purchasers. All five of the leases between Drexel Properties (lessee) and petitioner (lessor) were net leases for a 99-year term. All of the leases provide that all taxes, repair and maintenance expenses, insurance expenses, and utility expenses are to be paid by the lessees. If the lessees fail to maintain specified hazard and liability insurance policies or pay taxes, the leases provide that the lessor has the right to purchase the insurance and to pay the taxes, and then the lessor can collect its expenses from the lessee, plus specified interest. If the lessee litigates the taxes on the property, the leases provide that a bond exceeding the tax liabilities must be supplied to the lessor. All of the leases periodically increase the lease payments if the consumer price index increases. All the leases provide that the lease payments shall not be reduced below the initial lease payments. In each lease, a duty is imposed upon the lessees to maintain, repair and replace the improvements (once the improvements have been *462 constructed). If the lessee defaults, the lessor may, under each lease for the cooperative developments, enter the premises with or without process of law, evict the tenants, and declare the improvements forfeited as liquidated damages. The lessor may also exercise its rights under the leases for the cooperative developments to accelerate the lease payments and demand the full payment of the total rental due for the remaining balance of the 99-year term of the lease, or, in the alternative, demand such lesser amount as specified in the lessor's notice to lessee. Upon any default by lessee, the lessor is entitled to reimbursement for his costs, plus interest. Default provisions are also included in the leases involving the condominium developments. No restrictions exist for the sale or assignment of the leases by lessor. Pursuant to the terms of such leases, the obligations thereunder constituted a lien against the entire property. The purchasers of the individual apartments assumed payment of their proportionate share of the ground rent. In the event of a default on the part of any individual purchaser, the remaining purchasers were obligated to make up any deficiency. However, *463 the interest of the lessor was subordinated to an institutional mortgage obtained to finance in part the cost of the individual units. Every apartment purchaser in each of the five developments purchased his unit knowing his purchase was subject to the terms of a 99-year land or recreational lease. All of the units, both cooperative and condominium, were sold during the years here in issue with the contemporaneous agreement of the purchaser to subject himself to the applicable cooperative ground lease or condominium recreation ground lease. Prior to January 1, 1973, petitioner did not receive any salary from either Drexel Properties, Inc., or Drexel Construction Company. Subsequent to January 1, 1973, petitioner began receiving an annual salary of $75,000 from Drexel Properties. Petitioner has never received any salary from Drexel Construction Company. Prior to the Georgian Court South development, petitioner advanced the following expenses to Drexel Properties in addition to the original costs of the land: Payments to Cypress Realty
$ 5,000.00
Tax Stamps
616.50
Brokerage Fee
9,000.00
Recording Fees, etc.
8,200.00
Survey Expenses
225.00
Architectural Fee
1,500.00
Telephone
705.62
Miscellaneous
202.00
Interest
6,210.00
Real Estate Tax
1,917.09
Total
$33,576.21
*464 All of the above expenses except for the interest and real estate tax expenses, were ultimately reimbursed to petitioner by Drexel Properties. Petitioner deducted on his tax returns the interest and real estate tax expenses. During the period involved in this proceeding, petitioner made the following advances to Drexel Properties: Date
Amount
Dec. 31, 1968
$100,000.00
Jan. 31, 1969
5,000.00
Feb. 28, 1969
29,000.00
Mar. 18, 1969
30,000.00
Sept. 1969
275,000.00
1970
82,059.00
Total
$521,059.00
Furthermore, petitioner advanced substantial sums to Drexel Construction Company during the years here in issue on behalf of Drexel Properties. During the years 1967 through 1971, petitioner received and reported the following lease income regarding the five cooperative and condominium developments: 1967
1968
1969
1970
1971
Georgian Court South
$ 20,000.
$ 60,000.
$ 60,000.
$ 60,000.
$ 60,000.
Georgian Court North
35,000.
60,000.
60,000.
60,000.
Virginian Apartments
60,430.
60,430.
65,181.
Imperial Point
Colannades
12,173.
112,020.
186,302.
Imperial Point
Gardens
7,036.
41,588.
Totals
$ 20,000.
$ 95,000.
$192,603.
$299,486.
$413,071.
*465 Neither Drexel Properties nor petitioner obtained any formal or informal real estate appraisals, formal or informal market surveys, formal or informal economic analysis, or formal or informal recommendations from any parties concerning the fair rental values of any of the real estate leased by Drexel Properties from petitioner during or prior to the years here in issue except for the appraisals made in November of 1970, to enable Drexel Properties to obtain a $2,000,000 loan from Hotel Investors, a Maryland real estate investment trust. A pro forma baance sheet showing the assets, liabilities and capital of Drexel Properties as of the close of its fiscal years ending September 30, 1966 to 1971, inclusive is as follows: BALANCE SHEET [SEE TABLE IN ORIGINAL] In the notice of deficiency transmitted to Drexel Properties, the respondent determined that the so-called "excess rentals" provided for in the land and/or recreational leases should be capitalized and the value thereof treated as additional consideration received by Drexel Properties on account of the sale of the individual units, citing secs. 61, 1001 and 482. In the amended answers, which were conditioned upon *466 the Court not adopting the position set forth in the notice of deficiency, the respondent has reallocated the total cost of each development between the units sold by Drexel Properties and the capitalized value of the so-called "excess rentals" to be assumed by the purchasers of such units, thereby reducing the cost or basis of Drexel Properties of the units sold. In the notice of deficiency transmitted to the petitioner, respondent determined that the additional consideration alleged to have been received by Drexel Properties on account of the so-called "excess rentals" provided for in the land and/or recreational leases as capitalized by the respondent constituted a distribution by Drexel Properties to the petitioner with respect to the stock of Drexel Properties, taxable as a dividend to the extent of the earnings and profits and as a capital gain to the extent that the balance exceeded petitioner's adjusted basis of the stock of Drexel Properties. In the amended answers in the case of the petitioner, likewise conditioned upon the Court not adopting the respondent's position in the statutory notice of deficiency, the respondent adjusted the income attributable to the petitioner *467 to reflect the adjustments made by the respondent in the amended answers in the case of Drexel Properties. OPINION In his notices of deficiency in these cases, the respondent followed the same course which was rejected by this Court in Lakeside Garden Developers, Inc. v. Commissioner,T.C. Memo 1976-290, on appeal to the 5th Circuit, and Friedman v. Commissioner,T.C. Memo 1977-201. Nothing has transpired in the interim to change our opinion. In addition, the factual determination by the respondent that any so-called excessive rentals were paid for the land in the case of the cooperative developments and for the recreational facilities in the case of the condominium developments, has been seriously challenged. Petitioner contends that in setting the terms of the leases between petitioner and Drexel Properties, there was not in fact any overreaching which would warrant the reallocation of income between Drexel Properties and the petitioner under section 482, or otherwise. Both sides presented expert testimony with respect to the value of the land contributed to or sold to Drexel Properties by the petitioner for development. It is *468 unnecessary to review the testimony of each of these witnesses. In context of the total value of these developments, differences between the expert witnesses with respect to the initial land value is not signficant. After reviewing the testimony of these witnesses, the Court has found the value of the land at the time it was dedicated to the project by the petitioner. With respect to the leasehold interests acquired by the petitioner, the experts agreed that upon the "sell out" of the development such leases had a fair market value equal to 10 times the annual rental. The experts also seemed to agree that prior to the "sell out" the leases had no readily ascertainable fair market value. In light of such testimony, the Court must rejected t determination of the respondent in the notices of deficiency, not only for the reasons set forth in the Lakeside Garden Developers and Friedman cases, but because the evidence adduced in this case simply is not supportive of the notices of deficiency. The terms of the leases involved in this proceeding were set prior to or at the commencement of construction. In determining whether the parties would have made a different deal, if *469 they had been dealing at arm's length, it is immaterial what the leases were worth after all of the units had been sold. It is necessary to consider the respective contributions by the petitioner and by Drexel Properties at the start of the project. Drexel Properties had a nominal capitalization. Petitioner furnished both management and financing. Until such time as Drexel Properties had accumulated sufficient profits from the earlier developments, it had little to contribute. With respect to the first three cooperative developments, the benefits which accrued to the petitioner were only commensurate with the contribution made by him. He supplied the financing, undertook most of the management and planning and received no compensation. Any third party would have more than willing to undertake these projects, with the assistance of the petitioner, on the same basis. [4]
*470 What we really have here is in the nature of a joint undertaking between petitioner and Drexel Properties. The petitioner acquired the building sites, prepared the plans, obtained the building permits and arranged for the financing. Drexel Properties undertook the construction of the buildings and sale of the individual units. As a result, Drexel Properties would receive the gains or income from the sale of the units and the petitioner was to look to the assumption of the land or recreational leases for his gain. Similar deals are made everyday, although for the most part less favorably to the developer. At the outset, the leasehold interest acquired by the petitioner had only a speculative value. One of respondent's witnesses testified that prior to the "sell out" such leases had no fair market value. While this might be extreme, such leases certainly did not have a value equal to 10 times the earnings at the time the project was conceived and the agreements entered into between petitioner and Drexel Properties. The further enhancement of the value of the leases through the lapse of time is only commensurate with the fact that at the "sell out" Drexel Properties has realized *471 its gain and no longer has any funds at risk. The petitioner's gain is represented by an obligation on the part of the owners of the units to pay an annual rental over a term of years. His interest in the project is still "at risk." That the risk was "real" is evidenced by the more recent litigation as well as legislation before the Florida State Legislature to modify or to declare invalid condominium recreational leases. [5]
*472 In the alternative, respondent in his amended answers would have the Court allocate to the basis of the land or recreational leases a part of the construction costs incurred by Drexel Properties, treating the amount so allocated as a distribution or dividend by Drexel to the petitioner, on the authority of Welsh Homes, Inc. v. Commissioner,32 T.C. 239 (1959), affd. 279 F.2d 391 (4th Cir. 1960). With respect to this issue, respondent admittedly has the burden of proof.Rule 142(a), Tax Court Rules of Practice and Procedure.
In the Welsh Homes case, the taxpayer acquired unimproved land, divided it into lots, and built a house on each lot. He then created what is known in Maryland as a "ground rent" by entering into a lease with a "straw corporation" as lessee for a term of 99 years, renewable forever. On the sale of the house, the lease was assigned to the purchaser. Respondent sought to capitalize the value of the "gound rent" as a part of the consideration in computing the gain on the sale of the house. That position was rejected by this Court. In the recomputation of the resulting tax liability, respondent thereupon reallocated the total *473 cost of the lot and the house between the seller's retained fee or reversionary interest in the improved property and the leasehold interest sold. Respondent's recomputation was adopted by the Court and affirmed on appeal. The decision in the Welsh Homes case was predicated on the fact that the taxpayer entered into a 99-year lease of the improved property, retaining a reversionary interest in both the land and the improvements thereon. Therefore, it was held that the cost of the improvements should be allocated, in part, to the reversionary interest retained by the taxpayer. With respect to the cooperative apartments involved in this proceeding, the ultimate result is analogous to the result in the Welsh Homes case. There is a distinction, however, in that Drexel Properties entered into a lease with the petitioner acquiring use of the land prior to building any apartments. Drexel Properties then erected the apartments and sold the units subject to the ground lease. Petitioner's position was no different than that of any owner of the fee who might grant a 99-year lease to a developer for the construction of a building. Much of downtown New York City was developed in *474 this manner. Drexel Properties was not a "straw corporation" as was the case in Welsh Homes. No gain is attributable to the lessor on account of any improvements erected on the property of the lessor except where shown to be in lieu of rent. M. E. Blatt Co. v. United States,305 U.S. 267 (1938). [6]
Respondent's entire case is built upon the recognition that petitioners and Drexel Properties are separate entities and should be recognized as such for tax purposes. This constitutes an absolute bar to the application of the Welsh Homes formula. In view of the fact that respondent claims that the rent standing alone was excessive, it would be difficult to conclude that the agreement on the part of Drexel Properties to bear the costs of erecting the buildings on the land constituted additional rent. Respondent has *475 failed to meet that burden. [7]
Finally, even if the Court were inclined to apply the Welsh Homes formula, substituting a value for each of the elements involved in accordance with our findings, it would be necessary to consider not only the land and construction costs incurred by Drexel Properties, but also the contribution made by petitioner in providing financing for these projects, undertaking the planning, supervision and management of the projects and providing an ultimate "fail safe" plan in the event the units did not sell. Petitioner received no compensation for his services. As was testified to by one of the expert witnesses and as has been exemplified by other cases before this Court, an agreement for a division of the gains between the developer and his limited partners on a comparable basis is not unusual. Petitioner and Drexel Properties each made a contribution to these developments and except *476 as hereinafter set forth, there is no basis for shifting a part of the cost incurred by Drexel Properties to the petitioner. In fact, with respect to the first three cooperative apartment developments, the petitioner made the greater contribution. With respect to the condominium developments, the analogy of the "ground rent" practice which prevailed in Maryland and is dealt with in the Welsh Homes case is even more remote. However, regardless of the inapplicability of the Welsh Homes formula to the condominium developments, the undisputed facts before the Court necessitate an adjustment in the cost of the land acquired by Drexel Properties, whether under section 482 or otherwise. At the trial, petitioner brought out the fact that the condominium concept was substituted for the cooperative development plan in order to satisfy the financing institutions. Petitioner testified that whether the property was developed as a cooperative or as a condominium, the end result was intended to be the same. For that reason, the rentals established for the recreational facilities were predicated on the value of the total land contributed by the petitioner to the condominium development, *477 rather than solely that portion of the land withheld as the site for the recreational facilities. Accepting this testimony, no justification exists for the sale by the petitioner of a part of the land to Drexel Properties for a cash consideration while at the same time establishing a rental to be paid by Drexel predicated upon the value of that land. To the extent that Drexel Properties paid for land as a purchaser and again was obligated to pay rentals on account of the same land, there is a divergence from the pattern which had been established in the case of the first three cooperative developments. Because of this divergence, the purchase of the condominium building sites by Drexel may be treated as a distribution by Drexel with respect to its stock taxable as a dividend to the extent of its earnings and profits and as a return on the petitioner's basis in the stock to the extent of any excess. Palmer v. Commissioner,302 U.S. 63 (1937); Crosswhite v. United States,438 F. Supp. 368 (D. Ore. 1977). See also Missimer v. Commissioner,T.C. Memo 1979-48, and cases cited therein. The amount paid for the purchase of the lands *478 by Drexel Properties would likewise be excluded from its costs. Estate of Lucas v. Commissioner, 71 T.C.     (Feb. 20, 1979). The Court is still faced with the question whether respondent's voluminous pleadings in this case are sufficient to encompass the treatment of the sales of the land by petitioner to Drexel Properties as a distribution with respect to its stock. If the parties are unable to resolve that question, it will be decided in the recomputation of the deficiencies under Rule 155. Decisions will be entered under Rule 155. Footnotes
2. References to Harry T. Mangurian, Jr., are intended to include Dorothy J. Mangurian to the extent that she participated as his wife in the real estate transactions. Dorothy J. Mangurian participated in the transactions during the years here at issue only to the extent either necessitated by her joint ownership of assets or to subordinate her inchoate dower as the wife of Harry T. Mangurian, Jr.↩
3. The leasehold should probably have proportionate value of 126/139th of $600,000 on or before September 30, 1967.↩
4. In contrast to respondent's position here, in Friedman v. Commissioner,T.C. Memo 1977-201↩, in consideration for providing a loan of the initial funds to acquire the building site, some of the taxpayers were given an opportunity to purchase the recreational lease at cost. By implication, respondent conceded the reasonableness of that action and the only issue for decision related to the determination of the original issue discount under section 1232.
5. Avila South Condominium Association, Inc. v. Kappa Corporation,347 So. 2d 599 (Fla. 1977); Commodore Plaza at Century 21 Condominium Association, Inc. v. Saul J. Morgan Enterprises, Inc.,301 So. 2d 783 (Fla. App. 1974); Point East Management Corp. v. Point East One Condominium Corp.,282 So. 2d 628 (Fla. 1973), cert. denied 415 U.S. 921, 94 S. Ct. 1421, 39 L. Ed. 2d 476 (1974); Wechsler v. Goldman,214 So. 2d 741 (Gla. App. 1967); Fountainview Association, Inc. v. Bell,214 So. 2d 609 (Fla. 1968) affg. 203 So. 2d 657↩ (Fla. App. 1967). See also, Anderson, "Legal Protection for Florida Condominium and Cooperative Buyers and Owners," 27 U. of Miami L. Rev. 451 (1973).
6. Section 109 goes so far as to exclude from the income of the lessor the value of improvements erected by the lessee on the leased property upon the termination of the lease, except where it can be shown where such improvements constitute rent.↩
7. We need not decide whether such costs may have been incurred in recognition of, and as part of the consideration for, petitioner's contribution in providing financing, supervision and management. Respondent has not sought to tax the petitioner on this basis.↩