GORDON P. CONNOLLY and BETTY H. CONNOLLY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Connolly v. Commissioner
Docket No. 3106-74.
United States Tax Court
T.C. Memo 1975-318; 1975 Tax Ct. Memo LEXIS 55; 34 T.C.M. (CCH) 1379; T.C.M. (RIA) 750318; October 23, 1975, Filed Richard J. Alfieri, for the petitioners. William R. McCants, for the respondent. RAUM
MEMORANDUM OPINION RAUM, Judge: The Commissioner *56 determined deficiencies in petitioners' Federal income tax for the years 1968 through 1970 as follows: Year
Deficiency
1968
$ 9,208.04
1969
35,202.17
1970
8,886.50 Several matters having already been resolved by the parties the sole remaining issue is the proper computation of petitioners' gain on the sale of interests in certain co-operative apartment complexes. The case was submitted solely on a stipulation of facts. However, although the stipulation and accompanying exhibits contain a considerable amount of information, there are significant aspects of the transactions involved that are either left unexplained or are presented in a confusing and sometimes contradictory manner. In the circumstances we must do the best we can in resolving the issue presented by the parties, keeping in mind that since the burden of proof is upon the petitioners they must bear the consequences of any deficiencies in the stipulated materials. Petitioners, husband and wife, resided in Pompano Beach, Florida, at the time they filed their petition herein. For each of the taxable years 1968, 1969 and 1970 they timely filed joint Federal income tax returns on an accrual basis of accounting. *57 Petitioner Gordon P. Connolly has been and continues to be a general contractor duly licensed, and in good standing, under the laws of Florida. During the years involved herein, and for many years prior thereto, he was engaged in the business of building, developing, and selling various types of residential properties. His wife, Betty, also participated in the business, serving as secretary and bookkeeper. On October 18, 1967, petitioners purchased from unrelated parties four undeveloped lots in Pompano Beach, only two of which are involved herein, at an aggregate cost of $ 73,437.50. Petitioners' allocated costs of these two lots appear to have been $ 18,191.05 and $ 17,718.75, respectively. Shortly thereafter Gordon constructed an apartment building on each of these lots. The first, containing 36 apartments, was completed in 1968, and was named Garden Isles Apartments No. 1; the second, containing 30 apartments, was completed in 1969, and was named Garden Isles Apartments No. 2. Each property was financed by a mortgage loan, upon which petitioners were primarily liable; the amounts of such mortgage loans outstanding at the time of the transactions here in question were $ 432,000 *58 and $ 420,000, respectively. In what was obviously the first step in the exploitation of these properties by means of a technique or device (or a variation thereof) which has been familiarly described by use of the term "co-operative", petitioners organized two non-profit Florida corporations, Garden Isles Apartments No. 1, Inc., and Garden Isles Apartments No. 2, Inc. Although the stipulation of facts states that "[the] stock of the corporations was held by petitioners", the stipulated materials contradict this statement. No stock whatever appears to have been issued. Thus, the certificate of incorporation of Garden Isles Apartments No. 1, Inc., explicitly provides that "[the] corporation is organized on a non-stock basis, and membership in the corporation shall be limited to those persons holding proprietary leases entitling them to occupy the dwelling purposes apartments in the building" [sic]. Further, in respect of "membership" in the corporation, the by-laws of that corporation state that "[a] separate Proprietary Lease shall be issued for each apartment unit, and each Proprietary Lease shall constitute a separate membership, and entitle the holder thereof to cast one *59 vote". The record does not show that petitioners ever held any "proprietary leases" in respect of the property identified with either corporation. Instead, the record does affirmatively establish that upon completion of the construction of the two buildings petitioners leased the two parcels of land together with the improvements thereon to the respective corporations for 99 years. At this point, the stipulation of facts mysteriously states that "the petitioners proceeded to sell to unrelated third-party purchasers Membership Certificates, together with Certificates of Ownership, and Co-operative Apartment Proprietary Leases". Each proprietary lease related to a specifically designated apartment and extended for a term of years which expired upon the termination of the respective 99-year lease of the entire premises in which the particular apartment was located. How petitioners were able to sell such 99-year proprietary leases with respect to the individual apartment units after they had already disposed of the entire premises to the corporations for 99 years was never explained to us. Nevertheless, both parties herein have proceeded upon the assumption that petitioners in fact made *60 such "sales", that they in fact received substantial consideration in exchange for what they sold, and the only question the parties present to us here is how the gain on such sales is to be computed. Puzzled as we are about the precise nature of the transactions involved, we will nevertheless attempt to deal with the issue presented. Preliminarily, we return to the basic 99-year leases which petitioners entered into with each of the corporations. Each such lease provided for an initial annual rental, $ 10,800 in the case of Garden Isles Apartments No. 1 and $ 9,000 in the case of Garden Isles Apartments No. 2, to be revised every five years in accordance with a specified consumer price index, the annual rent for any year, however, never to be less than the initial rental. In addition to the annual rental, the corporate lessee agreed to pay all taxes assessed against the property, all charges for utilities, and to assume the outstanding mortgage indebtedness ($ 432,000 in the case of the first corporation and $ 420,000 in the case of the second), which was payable in monthly installments over a 23-year period. The lessee was also obligated to maintain, repair and insure the premises *61 and covenanted that it would rebuild the improvements in the event they were damaged or destroyed. Should the insurance proceeds exceed the cost of the repair or reconstruction, the lessee would receive the excess, but if it failed to perform its obligations in this regard, the proceeds would be paid to the lessors as liquidated damages. Furthermore, damage to or destruction of the buildings would not relieve the lessee of its obligation to pay rent. By the terms of each agreement the lessee's interest was freely transferable, provided however, that "this lease is in good standing and provided further that said assignment is evidenced by an instrument in writing, which among other things, shall provide that the assignee shall expressly accept and agree to all terms and covenants in this lease agreement * * *". In each case the lessee covenanted that it had no power to incur any indebtedness giving a right to a lien of any kind upon the interest of the lessors in the land, and that no person should ever be entitled to any lien by reason of "any act or remission" of the lessee which would be "superior to the interest in this lease reserved to the Lessors upon the leased premises". *62 Another provision specified that in the event of default by the lessee in complying with the terms of the agreement, which remains uncured after a specified period following notice thereof, the lessors may elect to terminate the lease and reenter the premises, the lessee forfeiting all claims and interests in the premises, all improvements, and all personal property usually situated thereupon. As noted above, each of the corporate lessees (or "co-operatives", as they were sometimes referred to) was a nonprofit membership corporation in which membership was restricted to persons holding proprietary leases in respect of particular apartments. A membership certificate in prescribed form was to be issued to the holder of a proprietary lease. Each proprietary lease was between the particular co-operative (Garden Isles Apartments No. 1, Inc., or Garden Isles Apartments No. 2, Inc.), as lessor, and a named "member", as lessee. However, a person could obtain such a proprietary lease and membership only upon application to the board of directors of the corporation, which supervised and controlled the operation and management of the corporate enterprise. Pursuant to the applicable certificate *63 of incorporation, each corporation [1] initially had three named directors (the two petitioners and their attorney), who were to continue as such until all the dwelling units "have been sold or disposed of or until the expiration of two years from the date of the filing of these Articles of Incorporation, whichever event occurs first". Thereafter, there were to be five directors, elected by the members. The proprietary leases did not fix any specified rental payable by the members. Instead, they contained provisions (required by the corporate by-laws) for the periodic assessment against the members of sums determined by the board of directors to be "necessary and adequate for the continued ownership *64 and operation of the corporate property". Such sums included not only each member's pro rata share of the rental due "under the 99 year lease under which the Co-operative is in possession of the land and the building," but also additional amounts (based on a schedule fixing a designated percentage for each apartment) with respect to all other charges, such as taxes, maintenance, payments on the mortgage indebtedness which the corporation had assumed under its 99 year lease with petitioners, etc. In respect of the mortgage payments, however, any member could elect to prepay his fixed share of the principal amount of the mortgage indebtedness. The proprietary leases also contained numerous provisions imposing restrictions on the use of the premises, transfer of the leases and subletting, allocating maintenance responsibilities between the member and the corporation, and dealing with such problems as violations of these provisions, termination of the lease, and delivery and acceptance of the premises. Furthermore, each member "agrees that any and all of his rights hereunder in all respects shall be, and the same are hereby, subject to the existing long term lease of which the Co-operative *65 is the lessee". As indicated above, the parties have stipulated that petitioners proceeded to "sell" membership certificates, together with certificates of ownership [2] and proprietary leases in the two Garden Isles developments. The parties are in agreement that petitioners thus received $ 173,500, $ 768,640 and $ 293,410 during the years 1968, 1969 and 1970, respectively, which they reported as ordinary gross income from such sales. To compute the net profit petitioners subtracted their costs of construction applicable to the apartments thus "sold" -- $ 119,324, $ 528,965.06 and $ 212,306.20 for the years 1968, 1969 and 1970, respectively. The Commissioner does not dispute the fact that these figures accurately reflect the costs involved. Petitioners' computation of profits may be shown in the following table: 1968
1969
1970
Income from sales
$ 173,500.00
$ 768,640.00
$ 293,410.00
Cost of Improvements
119,324.00
528,965.06
212,306.20
Profits
$ 54,176.00
$ 239,674.94
$ 81,103.80
*66 In 1970, the petitioners sold their fee interests in the entire Garden Isles Apartments No. 1 property (including all of their interests in the 99-year lease to Garden Isles Apartments No. 1, Inc.) to an unrelated third party for $ 103,000. On their income tax return for that year, gain from this sale was reported as follows: Sale Proceeds
$ 103,000.00
Less Cost of Land
18,191.05
Long-Term Capital Gain
$ 84,808.95 During the taxable year 1971, which is not here in issue, petitioners sold their corresponding interests in the Garden Isles Apartments No. 2 property for $ 90,000, and reported on their return for that year gain from this sale as follows: Sale Price
$ 90,000.00
Less Cost of Land
17,718.75
Long-Term Capital Gain
$ 72,281.25
The Commissioner does not dispute the accuracy of any of the foregoing computations as such, but he does argue that petitioners used the wrong bases in computing their profits on sales of the leaseholds as well as their gains on sales of the reversions. As to each leasehold, petitioners used the allocable construction costs of the building as their basis, and as to each of the reversions they used merely the *67 cost of the respective lot. On the other hand, the Government contends that the total basis for each property (land and building) must be allocated between the leaseholds and the reversion in such manner that a portion of their total investment in both land and building is appropriately reflected in the leaseholds as well as in the reversion. Thus, it is essentially the Government's position that petitioners had a fee simple interest in the land and building of each Garden Isles property; that their basis in each such property was the sum of the cost of the lot and the cost of the building; that when they gave 99-year leases to the corporations (out of which the 99-year proprietary leases were issued) they divided each fee simple interest into two parts, namely, a leasehold interest and a reversion; that the basis of the entire property (land and building) must therefore be allocated to each part; that an appropriate method is to spread that basis between the carved out leasehold interests and the reversions in proportion to their relative fair market values; and that in the absence of any better evidence of such values the prices at which the various interests (leaseholds and *68 reversions) were in fact sold could be taken as the values in question. In determining the deficiencies herein the Commissioner computed a basis for the leaseholds in accordance with the above. The result of such computation was a basis for the leaseholds that was smaller than the one used by petitioners (cost of the buildings), coupled, however, with a basis for the reversions that exceeded the one used by petitioners (cost of the land). As a consequence, there was an increase in the profit realized upon the sales of the leaseholds, but a decrease in the gain realized upon sale of the reversions. [3] On the other hand, petitioners contend that they correctly used the cost of construction as the basis in determining gain on sale of the leaseholds and the cost of the land in computing gain on sale of the reversions. We hold, on the authority of Welsh Homes, Inc. v. Commissioner,279 F. 2d 391 (C.A. 4), that the Commissioner must prevail.
*69 In Welsh Homes the taxpayer corporation was a builder that acquired unimproved land in fee simple, subdivided it, and built houses thereon. Upon completion of construction of a house the taxpayer would enter into a lease with a wholly owned or straw corporation covering house and lot for a term of 99 years, renewable forever and subject to a specified annual ground rent. Thereafter the ultimate "purchaser" of the property would receive an assignment of the lease, and would become liable for the reserved ground rent during the period of his tenancy. The retained ground rent or reversion had a determinable fair market value, and was readily salable. However, under applicable Maryland law, the original "purchaser" of the property was entitled, but could not be compelled, to redeem the ground rent and thereby become the owner in fee simple of the entire property, land and building. Two principal issues were considered in that case. The first, which is not present here, was whether, in computing the taxpayer corporation's gain on sale of the property to the ultimate purchaser, the amount received by the seller should include not only the contract price for the sale of the leasehold *70 but also the value of the reversion. The Government's theory was that the reversion or ground rent was simply a financing device, equivalent in substance to a retained mortgage, and since the amount involved in the latter is always included in determining the gross amount received upon sale of property, the value of the reserved ground rent should similarly be included. The Court held, relying upon an earlier case ( Commissioner v. Simmers' Estate,231 F. 2d 909 (C.A. 4)), that the value of the reserved ground rent could not be included in the amount of the sales price. No such issue is involved in the instant case, since both parties appear to agree that petitioners' reversionary interests in the properties should not be added to the amounts received by them in the leasehold sales. The second issue decided by the Court of Appeals in Welsh Homes, however, is virtually identical with the one now before us. A sharp controversy had developed between the parties therein in the computation of the tax. As in the present case, the taxpayer in Welsh Homes had simply deducted the cost of construction from the proceeds of sale to determine the amount of realized *71 gain. That was the method that had been used by the taxpayer in Simmers, but that aspect of the computation was not in issue in Simmers, the sole matter in controversy therein having been the issue relating to the inclusion of the value of the reversion in the sales price. The question relating to the proper amount of basis to be deducted from the sales price was presented for the first time in Welsh Homes.[4]
The differences between the two computations -- i.e., the one urged by the petitioners herein (like the one used in Simmers) and the one proposed by the Government in this case and approved in Welsh Homes -- may perhaps be explained *72 by an extensive quotation from the opinion of the Fourth Circuit in Welsh Homes (279 F. 2d at pp. 393-394): There is however, a substantial difference between the two cases in the computation of the tax. In Simmers', after the principle had been established, the computation was agreed upon and its correctness was not questioned in the Tax Court or in this court on appeal. The taxable gain was arrived at by deducting the aggregate cost of building the houses from the aggregate selling price of the leasehold interests. In the present case a different method of computation was proposed by the Commissioner n1 and approved by the Tax Court and is now in issue here. It is based on the theory that in the transfer of a leasehold interest the purchaser acquires and the builder retains an interest in both the lot and the building; and since the leasehold interest has been carved out of the whole and its cost cannot be definitely shown, it must be ascertained by allocating the entire cost between the interest sold and the interest retained. For this purpose the ratio of the value of the leasehold to the aggregate value of the leasehold and the reversionary interest is first *73 ascertained and then the ratio is applied to the aggregate cost of the land and the building. The result obtained represents the cost basis of the leasehold. Assume, for example, that a purchaser pays $ 12,000 for the leasehold interest in a lot improved by a dwelling subject to an annual ground rent of $ 120.00, which is capitalized under the Maryland law at 6 per cent and therefore has a value of at least $ 2,000. In such case the value of the whole property is $ 14,000. Assume, also, that the cost of the land was $ 500.00 and the cost of the house $ 10,000, or a total of $ 10,500. The ratio of the value of the leasehold to the value of the whole property is therefore twelve-fourteenths, and if this ratio is applied to the total outlay, the cost of the leasehold is found to be $ 9,000 and the taxable gain to be $ 3,000. If, on the other hand, the agreed upon calculation in the Simmers' case is applied, the taxable gain in this transaction would be the difference between the purchase price of $ 12,000 and $ 10,000, the cost of the building, or $ 2,000. n2 (Footnotes omitted.) In sustaining the Commissioner's computation the Court of Appeals stated (279 F. 2d at p. 395): *74 Allocation of costs is normally employed for the establishment of a cost basis of property when a taxpayer acquires an aggregate of assets for a single unallocated purchase price and subsequently sells a portion of the whole. * * * The pending case presents the reverse of the situation. The cost of the land and the cost of the building, the constituent elements of the property which the builder has acquired are known, but in the building operation they have been incorporated into a single property and when a part interest in the whole -- the leasehold -- is granted to the lessee and the reversionary interest or ground rent is retained by the lessor, it is impossible to ascertain what part of the value of these interests is attributable to the land and what part to the building. It follows that the cost of land and building must be allocated between the interest granted and the interest retained. The taxpayer's contention that the allocation of costs is not necessary must be rejected since it is based on the mistaken notion that the purchaser of the leasehold acquires an interest in the building *75 but no interest in the land. In various types of situations, more or less analogous to that in the pending case, the allocation of costs or expenses has been approved when it is the only practicable method of reaching a fair and equitable result. * * * In our opinion the costs were properly allocated in computing the taxable gain in the instant suit. In our judgment the same result is called for here. To be sure, there may be some differences in local law between the Maryland ground rent and the reversionary interest retained by petitioners in this case. And indeed Congress in 1963 in effect reversed that portion of Welsh Homes in respect of redeemable ground rents to the extent that it related to the amount to be included in the sales price of property subject to such a ground rent. See Pub. L. 88-9, 77 Stat. 6, adding new sections 163(c) and 1055 to the 1954 Code in place of provisions redesignated sections 163(d) and 1056, respectively; see also S. Rept. No. 72, 88th Cong., 1st Sess., p. 1, 1963-1 C.B. 417. But in the instant case the parties are in agreement as to the amounts to be treated as the proceeds of sale, and in accordance with that agreement, those *76 amounts, like the sales price in Welsh Homes, do not reflect any element of value relating to the reversionary interests. In short, as a result of the manner in which this case has been presented to us, the computation approved in Welsh Homes becomes highly pertinent here. In each case, the owner has carved out leasehold interests in which the lessee or lessees acquired occupancy rights for 99 years in both land and building. In Welsh Homes, a single purchaser obtained such rights, whereas here those rights are held jointly by the various members of the co-operatives and the co-operatives themselves. From the Lessors' point of view they have parted with or sold an interest in both land and building for a period of 99 years. Such differences as may exist between Florida law and Maryland law do not appear to be of such character as to render Welsh Homes inapplicable in the context of this case and the manner in which it has been presented to us. However the purchased interests in this case may be characterized, as in Welsh Homes, we cannot conclude that the lessees simply purchased the lessors' entire interest in the improvements and merely leased the underlying lots. *77 [5]
We reemphasize what we have indicated at the outset of this opinion. In view of the condition of this record we do no more than decide the narrow issue presented by the parties. Our disposition of this issue follows the Welsh Homes computation. It is not intended as suggesting that the parties properly analyzed the situation in presenting the issue as they did. [6] The conclusion we reach is based strictly upon the issue as presented and as we understand it *78 in the very dim light of a most unsatisfactory record. In the circumstances our disposition of this case can hardly have any useful precedential value in other cases where the matters in controversy are more sharply brought into focus against the background of a more clearly developed record. Petitioners make a further contention based upon the fact that in determining the relative values of the leaseholds and the reversions, the Commissioner used the sales prices of the reversions which they in fact received in 1970 and 1971. They argue that since the Commissioner has resorted to such 1970 and 1971 sales prices he has violated the requirements of an annual system of accounting. The point is wholly without merit. The test called for by the Welsh Homes formula takes into account *79 the relative values of the leasehold and the reversion as of the time of sale of the leasehold, when the owner's fee simple interest was divided into two parts, leasehold and reversion. In Welsh Homes itself a ready means (apparently accepted locally) for determining the value of the reversion was simply to capitalize the ground rent at a given rate. Here, the Commissioner took as the value the actual price at which each reversion was sold. To be sure, those sales occurred from within about one to three years after the sales of the leaseholds. Conceivably, the values of the reversion at the times the leaseholds were sold might have been different. Nevertheless, we cannot say that such values were in fact different, or that the Commissioner, in the absence of any circumstance indicating the unreliability of such values, acted arbitrarily in accepting them as indicative of values as of the somewhat earlier dates. [7] The burden of proof was upon the petitioners. It was open to them to show that the values at the time of sale of the leaseholds were different and what those values were, but they offered no such evidence. In the circumstances the Commissioner's determination must stand. *80 Decision will be entered for the respondent.
Footnotes
1. The record contains only the certificate of incorporation of Garden Isles Apartments No. 1, Inc., but all the other basic documents in respect of both corporations are substantially identical in all material respects, and the parties herein have not sought to differentiate between the two corporations in respect of the issue before us. In the circumstances, we may reasonably assume that like provisions appear in the certificate of incorporation for Garden Isles Apartments No. 2, Inc.↩
2. A certificate of ownership states primarily that the named member is the "owner" of a proprietary lease of a specifically designated apartment of Garden Isles Apartments No. 1 (or 2), Inc.↩
3. The Commissioner specifically determined that petitioners overstated the cost of the leaseholds sold by $ 10,441.83, $ 46,595.07 and $ 28,172.95 on their returns for 1968, 1969 and 1970, respectively, and on the 1970 return understated by $ 46,447.93 the cost of the reversion in the Garden Isles Apartments No. 1 property. (The year 1971 is not here in issue.) Although the record is somewhat confusing in regard to the manner in which these figures were computed, our best understanding thereof is reflected in the following table, all of the figures in which were derived from explanatory materials attached to the Commissioner's deficiency notice: Cost of Land and Improvements
Lots
Lots
Construction
Costs
Garden Isles #1
Garden Isles #2
1968
$ 18,191.05
$ 17,718.75
$ 119,324.00
Cost of Land and Improvements
Lots
Construction Costs
Garden Isles #1
1969
1970
Total Cost
$ 18,191.05
$ 528,965.06
$ 212,306.20
$ 896,505.06
(B)
(D)
Percent
Basis
age
(A)
of
(C)
Reported on
(E)
Total
Fair
Fair Market
Market
Basis
Taxpayers'
Adjustments
Value
Value
(A) /
(B) X
Returns
(D) - (C)
1,428,5
896,505.06
50
Leaseholds sold in
$ 173,500
12.145
$ 108,882.17
$ 119,324.00
$ 10,441.83
1968
Leaseholds sold in
768,640
53.806
482,369.99
528,965.06
46,595.07
1969
Leaseholds sold in
293,410
20.539
184,133.25
212,306.20
28,172.95
1970
Reversion sold in
103,000
7.21
64,638.98
18,191.05
(46,447.93)
1970
Reversion sold in
90,000
6.3
56,480.67
17,718.75
(38,761.92)
1971
$ 1,428,550
100.
$ 896,505.06
$ 896,505.06
0
Although petitioners object to the use of this method of allocating costs in its entirety, they do not challenge any of the specific steps, computations or assumptions embodied in the determination, except insofar as the Commissioner used for the fair market value of the reversions the prices at which they were eventually sold, a contention considered at p. ,infra.↩
4. Indeed, when Welsh Homes was in the Tax Court, the only issue originally disposed of in the opinion in 32 T.C. 239↩ was the one relating to the amount to be included in the sales price; the second issue appears to have surfaced for the first time in the proceedings under our then Rule 50 involving the correct computation of the amount of deficiency. When the case reached the Court of Appeals, that issue assumed major proportions, and the opinion of the Fourth Circuit dealt primarily with that issue.
5. In this regard, we note that no evidence was presented from which it could properly be inferred that the rentals provided for in the 99-year leases petitioners entered into with each of the Garden Isles corporations were comparable to the fair rentals of the respective lots alone, a factor which might support a different conclusion. Cf. Rev. Rul. 70-607, 1970-2 C.B. 9. Indeed, there is evidence suggesting quite the contrary. Although the lots in question were acquired on October 18, 1967, for allocated costs of $ 18,191.05 and $ 17,718.75, respectively, the minimum annual↩ rental was set at $ 10,800 in the lease executed on November 30, 1968, and $ 9,000 in the lease executed on October 1, 1969.
6. Indeed, perplexing questions present themselves as to whether any cost basis should be deducted from the amounts received in the light of such cases as Crile v. Commissioner,55 F. 2d 804 (C.A. 6), certiorari denied 287 U.S. 600, and Gates v. Helvering,69 F. 2d 277 (C.A. 8); but see Welsh Homes, Inc.,32 T.C. 239, 252-254↩.
7. Indeed, this factor alone suffices to distinguish the present case from Seigle v. Commissioner,281 F. 2d 372 (C.A. 4), reversing 33 T.C. 255↩, on which petitioners rely. In particular, see pp. 377-378.