**August URBANEK, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 110–79T.**

United States Claims Court.

June 3, 1983.

Roger D. Osburn, Miami, Fla., for plaintiff.

Gilbert W. Rubloff, Washington, D.C., with whom was Asst. Atty. Gen. Glen L. Archer, Washington, D.C., for defendant.

## OPINION

KOZINSKI, Chief Judge.

At issue in this case is whether the taxpayer properly calculated the cost of certain condominium units which he built and sold in Boca Raton, Florida. The taxpayer allocated the entire cost of construction to the units themselves. The government argues that a portion of the cost should be allocated to the surrounding land, which was retained by the taxpayer and leased to the condominium owners. Under the government's theory, the gain from the sale of the units would be higher than reported.

## FACTS [1]

In 1969, taxpayer, August Urbanek,[2] formed a partnership to develop a 5.5 acre tract of land. The project called for the construction of two condominium towers on .9 acre located roughly in the middle of the tract. On the surrounding land, the partnership constructed various amenities such as a parking lot, a putting green, a swimming pool and a marina.

Sales of condominium units followed a pattern which was not uncommon to developments in Florida in the 1970s. Each buyer received fee simple title to his condominium and to a pro rata share of a package consisting of the land on which the towers were located, of a road connecting the towers with the public street and of the amenities. The partnership retained title to the approximately 4.6 acres which surrounded the towers and upon which the amenities were situated. The retained land was leased for 99 years to the Boca Towers Condominium Association, a nonprofit Florida corporation formed by the taxpayer and his partner in 1971.

The association agreed to a yearly net rental of approximately $160,000, with periodic increases geared to the consumer price index. The lease was negotiated between the partnership and the association at a time when the taxpayer and his partner were in control of both. Buyers of condominium units were required to become members of the association and to assume a pro rata share of the ground lease. Each buyer pledged his condominium as security for performance of his obligations under the lease.

At that time, Boca Raton limited the density of residential construction to 50.7 units per acre. This meant that the larger a tract of land a developer had, the more condominium units he could build. Construction did not, however, have to be evenly distributed over the tract. As in this case, the residential units could be concentrated in high-rise towers on a small portion of the land, so long as sufficient total land was dedicated to the project.

Perhaps because of the density ordinance, the value of land was frequently expressed in terms of the number of condominium units it would support. Thus, raw land in the general vicinity of the project was selling for $6,250 to $10,344 per unit in 1970–71, which, multiplied by 50.7 allowable units, amounted to $316,875 to $524,440 per acre.

The partnership sold the condominium units starting in 1972.[3] In calculating the gain from the sale of these units, the tax-

1. The facts set forth are only those relevant to this opinion. Additional facts are contained in the stipulation filed by the parties and the court's oral findings entered at the end of trial.

2. August Urbanek appears both personally and as representative of the estate of his deceased wife, Irene Urbanek.

3. Federal income taxes for the 1972 tax year are in question here.

payer subtracted from the sales price the cost of the .9 acre of land on which the towers were situated, plus the full cost of erecting the towers and the amenities. The government challenges this method of computation. In the government's view, the combined sale/lease package offered to prospective buyers enabled the taxpayer to defer some immediate income from the sale by converting sale proceeds into lease payments, thereby diminishing the effects of the progressive income tax. The government proposes to remedy this problem by reallocating some of the cost of construction to the lease, thereby lowering the cost of the units sold and commensurately raising the taxpayer's gain. The government relies upon *Welsh Homes, Inc. v. Commissioner,* 279 F.2d 391 (4th Cir.1960), and the reallocation formula adopted in that case (now commonly known as the *Welsh Homes* formula).

## DISCUSSION

### A. *The Welsh Homes Formula*

The taxpayer argues vigorously that marketing of the project as partially a sale and partially a lease served a legitimate business purpose and that both the sale and lease prices were set at market rates. In the taxpayer's view, this establishes that the lease payments represented only compensation for rental of the land and not deferred income from sale of the units, undercutting any justification for the government to reallocate costs between the two transactions. This argument might be persuasive if taxpayer had in fact established that the separate parts of the project represented separate transactions, each governed by independent market forces. However, the evidence paints a completely different picture: the sale of condominiums and the

lease of the ground surrounding them were integral parts of the same transaction, flip sides of the same economic coin.

To reach this conclusion, one need only examine the method employed by the taxpayer in setting the supposedly fair market rental under the ground lease. The taxpayer first set the fair market sales price of the 4.6 acres at $1.6 million. He came up with this figure by calculating that under the density ordinance, 4.6 acres of land could support 223 units; at $6,000 per unit, this amounted to approximately $1.6 million. The taxpayer next took one-tenth of this value, $160,000, as a fair market rental.[4]

■ The obvious flaw in the taxpayer's analysis is that he set the value of the 4.6 acres on the basis of a formula applicable to raw land capable of supporting condominium construction, but which is wholly inapposite to the land which was the subject of the lease. Whatever condominium-supporting capacity the 4.6 acres of land originally had was lost when they were dedicated to the project. The only reason the taxpayer was allowed to put the two towers on the .9 acre of land was that he committed to leave the 4.6 acres undeveloped and thereby complied with the density ordinance.[5]

Contrary to taxpayer's assertion, therefore, the $1.6 million valuation of the 4.6 acres (and consequently the $160,000 yearly rental) did not represent the fair market value of the land independent of the development project. Indeed, the evidence establishes that it is impossible to value the 4.6 acres for purposes of sale or rental, except with reference to the project as a whole. This is because no one other than the owners of the condominium units had any possible use for that land.[6] By placing the amenities on the 4.6 acres and dedicating the land to the project, the developer

---

4. The parties stipulated that one-tenth of the value of land was a fair market rental.

5. There were additional reasons why the 4.6 acres could not support further condominium construction, and indeed, could support no use other than that to which they were dedicated. The land was the site of various amenities which were owned by the condominium buyers; any construction on the 4.6 acres would

have interfered with use of the amenities and would have obscured the valuable views of many of the apartments.

6. The amenities themselves were sold to the condominium owners who were then entitled to their exclusive use. There was no possibility, therefore, that someone might be interested in buying the 4.6 acres to operate a business unrelated to the condominium project, such as a public recreation park.

limited demand for the land entirely to the captive market consisting of those persons who needed access to it for full enjoyment of their property.[7]

Moreover, individual rental payments under the lease could not be set independent of the sales price for each unit. The cash price for a unit plus the projected rental payments under the lease constituted an economic package which prospective buyers weighed as a whole. A lower sales price would have allowed taxpayer to charge higher rental payments and vice versa.[8] At one extreme, the taxpayer might have maximized the sales price by charging no rent at all, because a condominium unencumbered by monthly lease payments can command more than the same unit subject to lease payments. At the other extreme, the taxpayer might have maximized rental payments by charging very little or even nothing for the units. Between those two extremes, the taxpayer was relatively free to set the price/rental ratio in making up the package he offered buyers. While buyers could refuse to accept the package as a whole, they did not have occasion to bargain as to the allocation between sale price and rental, that decision having been made entirely by the taxpayer and his partner when they executed the lease on behalf of the association.

Just as the income from the two portions of the project are inextricably linked, so the expenses incurred must be treated as an integral whole. Various costs went into the project: the price of the land, the cost of construction, promotional expenses, management fees, brokerage commissions, etc. Each of these expenses went towards making the entire project more marketable; it is impossible to point to a particular expense and say it contributed to one aspect of the project and not to another.

The taxpayer, however, allocated all of the costs connected with the construction of the units and amenities to the condominiums; he allocated only the cost of the 4.6 acres to the lease. This allocation does not reflect reality because the value of the lease—and the rent it commanded—reflected the expenses incurred on the project as a whole, not merely the cost of buying the land. Allocation of only the cost of the raw land to the lease was therefore entirely arbitrary. As noted above, the taxpayer was free to manipulate the relative income from the sale and the lease. To permit him to allocate expenses arbitrarily—without reference to the allocation of the incomes he has selected—can lead to a serious and unjustified distortion in the gains reported for tax purposes.

The government proposes to remedy this problem by application of the *Welsh Homes* formula. *Welsh Homes* allocates the total expenses of the project between that portion of the transaction which results in immediate income (here the sale of the units) and that portion of the transaction which defers income (the lease), in the same ratio as their respective values in the year of sale.[9] The taxpayer is left free to set relative sales and rental prices. However, he is then tied to that same ratio in allocating expenses.

Aside from making theoretical sense, the *Welsh Homes* formula is easy to apply because it takes the sales and rental prices as given and avoids the uncertainty of estimates as to market value. The formula first divides the sales price of the units by the aggregate value of the property which consists of the sales price plus the value of

---

7. To be sure, *after* the lease was executed, the land would have a market value based upon the expectation of collecting rental income. However, that value would be entirely dependent upon the expected income to be derived from the lease and not upon the existence of a market for the land itself.

8. Because few people pay cash, the trade-off for the individual buyer in terms of his monthly budget would be between the rental under the ground lease and the mortgage payments.

9. For purposes of deriving this ratio, the value of the units is set at their sales price and the value of the lease is the capitalized rental payments. It should be noted that here, as in *Welsh Homes,* we deal with a lease where the reversionary interest is of negligible value. If the lease were substantially shorter than 99 years and the reversionary interest were found to have significant value, it may not be appropriate to limit the value of the leased land to the capitalized rental payments.

the lease.[10]  The resulting ratio is applied to the project cost to determine what portion should be allocated to the sale and what portion should be allocated to the lease.[11]

■ Because the *Welsh Homes* formula makes both theoretical and practical sense, the court adopts the defendant's position that it should be applied in this case.[12]

### B. *Depreciation*

■ Having lost on his principal contention, the taxpayer suggests that he should be allowed to depreciate the costs which were allocated to the leased land under the *Welsh Homes* formula.  The difficulty with taxpayer's argument is that he does not possess an asset which is capable of depreciation because all he has left is bare title to 4.6 acres of land.  The rule, of course, is that land is not a wasting asset and is therefore not capable of depreciation. *Houston Chronicle Publishing Co. v. United States,* 481 F.2d 1240, 1258 (5th Cir.), *cert. denied* 414 U.S. 1129, 94 S.Ct. 867, 38 L.Ed.2d 754 (1973); *Hoboken Land & Improvement Co. v. Commissioner,* 138 F.2d 104 (3d Cir.1943); Treas.Reg. § 1.167(a)–2 (1956).

■ It is true, as plaintiff argues, that the costs allocated to the land under *Welsh Homes* are costs of constructing the improvements.  However, the improvements merely lend an intangible benefit to the surrounding land;  they are not part of it. It was taxpayer who chose to sever ownership of the land from ownership of the improvements, leaving himself with nothing to depreciate.  *See F.M. Hubbell Son & Co. v. Burnet,* 51 F.2d 644, 645 (8th Cir.1931). He cannot now claim depreciation of an asset he does not own.[13]  Of course, since the taxpayer sold the 4.6 acres in a later tax year, he was entitled to add those costs to his basis in the land and thereby lower his gain from that sale.

### CONCLUSION

Taxpayer's income for 1972 shall be recalculated pursuant to the *Welsh Homes* formula.  The taxpayer is not entitled to depreciate any of the expenses allocated to the leased land pursuant to the formula.  The matter is set for a status hearing at 10:00 a.m., on Thursday, June 9, 1983, in Courtroom No. 4, Fifth Floor, National Courts Building, 717 Madison Place, N.W., Washington, D.C. 20005 to consider the course of further proceedings.[14]

10.  For reasons explicated at trial, the court determined that in 1972 the capitalized value of the lease was only nine times the annual rent to be received from the 108 units which were sold that year.

11.  A numerical example of the formula's operation can be found in *Welsh Homes.* 279 F.2d at 394.  The court will not perform the calculations here because the parties have agreed to stipulate the precise amounts once the court rules as to the applicability of the *Welsh Homes* formula.

12.  For reasons which are not entirely clear, the *Welsh Homes* court thought it significant to analyze the precise nature of the relative interests of the buyer and the seller under state law. 279 F.2d at 394–95.  The logic of the *Welsh Homes* formula does not, however, turn upon such fine points of local law and plaintiff's attempts to so limit application of the formula is rejected.  Indeed, there is no reason to limit the *Welsh Homes* approach to real estate transactions.  The allocation formula would appear to be applicable whenever a taxpayer singles out for separate treatment an integral portion of a transaction (*i.e.,* a portion which has no market value apart from the project as a whole) and obtains for it rental income or other deferred compensation.

13.  Insofar as *D. Loveman & Son Export Corp. v. Commissioner,* 34 T.C. 776, 806–08 (1960), *aff'd* 296 F.2d 732 (6th Cir.), *cert. denied* 369 U.S. 860, 82 S.Ct. 950, 8 L.Ed.2d 18 (1962), may be read as suggesting that a taxpayer can depreciate an asset he does not own, the court is unpersuaded and declines to follow.

14.  Plaintiff's counsel, who practices outside of Washington, D.C., may participate by conference call to be placed by the court.