731 F.2d 870
 84-1 USTC P 9374
 August URBANEK and Estate of Irene Urbanek, Deceased, August
Urbanek, Personal Representative, Appellants,
v.
The UNITED STATES, Appellee.
 Appeal No. 83-1262.
 United States Court of Appeals,
Federal Circuit.
 April 6, 1984.
 
 Stuart H. Singer, Miami, Fla., argued for appellants.
 Melvin N. Greenberg, Marlene K. Silverman and Roger D. Osburn, Miami, Fla., were on brief for appellants.
 Gilbert W. Rubloff, Washington, D.C., argued for appellee. With him on brief were Glenn L. Archer, Jr., Asst. Atty. Gen., Theodore D. Peyser and Robert S. Watkins, Washington, D.C.
 Before BENNETT, Circuit Judge, SKELTON, Senior Circuit Judge, and MILLER, Circuit Judge.
 JACK R. MILLER, Circuit Judge.
 
 
 1
 This appeal is from the judgment of the United States Claims Court (2 Cl.Ct. 574 (1983)) that August Urbanek and the estate of his deceased wife, Irene Urbanek (with whom August Urbanek filed a joint income tax return) recover from the United States only the sum of $69,358.46 in tax, $693.59 in assessed penalties, $15,889.27 in interest paid, plus interest on the foregoing as provided by law together with costs to the defendant, for the calendar year 1972. The suit was based on a 1977 Notice of Disallowance of August and Irene Urbanek's claim for refund of $173,268.43 plus interest. The $173,268.43 comprised a disputed deficiency in income tax of $139,897.46, interest of $31,972, and a late payment penalty of $1,398.97. The deficiency in income tax was based on August Urbanek's 50% distributive share of asserted additional income of a partnership from the sale of condominium units.[1] We affirm.
 
 
 2
 The factual background of this case found by the Claims Court rests on the stipulation of the parties and is set forth below (footnotes omitted).
 
 
 3
 In 1969, taxpayer, August Urbanek, formed a partnership to develop a 5.5 acre tract of land [in Boca Raton, Florida]. The project called for the construction of two condominium towers on .9 acre located roughly in the middle of the tract. On the surrounding land, the partnership constructed various amenities such as a parking lot, a putting green, a swimming pool and a marina.
 
 
 4
 Sales of condominium units followed a pattern which was not uncommon to developments in Florida in the 1970s. Each buyer received fee simple title to his condominium and to a pro rata share of a package consisting of the land on which the towers were located, of a road connecting the towers with the public street and of the amenities. The partnership retained title to the approximately 4.6 acres which surrounded the towers and upon which the amenities were situated. The retained land was leased for 99 years to the Boca Towers Condominium Association, a nonprofit Florida corporation formed by the taxpayer and his partner in 1971.
 
 
 5
 The association agreed to a yearly net rental of approximately $160,000, with periodic increases geared to the consumer price index. The lease was negotiated between the partnership and the association at a time when the taxpayer and his partner were in control of both. Buyers of condominium units were required to become members of the association and to assume a pro rata share of the ground lease. Each buyer pledged his condominium as security for performance of his obligations under the lease.
 
 
 6
 At that time, Boca Raton limited the density of residential construction to 50.7 units per acre. This meant that the larger a tract of land a developer had, the more condominium units he could build. Construction did not, however, have to be evenly distributed over the tract. As in this case, the residential units could be concentrated in high-rise towers on a small portion of the land, so long as sufficient total land was dedicated to the project.
 
 
 7
 ....
 
 
 8
 The partnership sold the condominium units starting in 1972. In calculating the gain from the sale of these units, the taxpayer subtracted from the sales price the cost of the .9 acre of land on which the towers were situated, plus the full cost of erecting the towers and the amenities. The government challenges this method of computation. In the government's view, the combined sale/lease package offered to prospective buyers enabled the taxpayer to defer some immediate income from the sale by converting sale proceeds into lease payments, thereby diminishing the effects of the progressive income tax. The government proposes to remedy this problem by reallocating some of the cost of construction to the lease, thereby lowering the cost of the units sold and commensurately raising the taxpayer's [sic partnership's] gain. The government relies upon Welsh Homes, Inc. v. Commissioner, 279 F.2d 391 (4th Cir.1960), and the reallocation formula adopted in that case (now commonly known as the Welsh Homes formula).
 
 
 9
 The Claims Court awarded Urbanek only $85,941.32 ($69,358.46 in overpaid tax, $693.59 in overpaid penalties, $15,889.27 in overpaid interest, plus interest on the foregoing, of the $173,268.43 plus interest in suit. Costs of $219.41 were awarded the Government.
 
 OPINION
 
 10
 The Claims Court found that the partnership's allocation of only the cost of the 4.9 acres of raw land to the leased land "does not reflect reality because the value of the lease--and the rent it commanded--reflected the expenses incurred on the project as a whole, not merely the cost of buying the land." We are satisfied that appellant has not shown that this finding is clearly erroneous. Heisig v. United States, 719 F.2d 1153, 1158 (Fed.Cir.1983). Our conclusion is stated with full recognition that the bona fides of appellant's method is not in question. However, irrespective of tax avoidance (or postponement[2]) considerations, reallocation may be deemed proper. Central Cuba Sugar Co. v. Commissioner, 198 F.2d 214, 215 (2d Cir.1952). Proper accounting practice is to allocate costs to fairly match such costs with related revenues. Seidler and Carmichael, ACCOUNTANTS' HANDBOOK (1981), 20-31; Davidson and Weil, HANDBOOK OF MODERN ACCOUNTING (1977), 17-14.[3] Thus, the Claims Court found that allocation of only the cost of the 4.9 acres of raw land to the leased land did not "fairly match" (i.e. "reflect reality") the costs incurred on the project as a whole with the rental revenue and condominium sales proceeds related to such costs.
 
 
 11
 Nor has appellant shown that the method of allocation used by the Claims Court, which the Government asserted in its amended answer to appellant's petition, does not clearly reflect income. Appellant's burden to show an abuse of discretion is a heavy one. See Brown v. Helvering, 291 U.S. 193, 203, 54 S.Ct. 356, 360, 78 L.Ed. 725 (1934) (citing, inter alia, Lucas v. American Code Co., 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538 (1930)); Lucas v. Structural Steel Co., 281 U.S. 264, 271, 50 S.Ct. 263, 265, 74 L.Ed. 848 (1930); Morgan Guaranty Trust Co. of New York v. United States, 585 F.2d 988, 997, 218 Ct.Cl. 57 (1978). See also I.R.C. Sec. 446(b); cf. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 546, 99 S.Ct. 773, 788, 58 L.Ed.2d 785 et seq. (1979). The taxpayer's argument (and the dissenting opinion's position) that the tax law allows a taxpayer to deduct as costs of goods sold all actual expenditures incurred in acquiring and improving property merely begs the question of what costs are properly allocable to the condominiums. Those costs that are properly allocable are obviously deductible as costs of goods sold.
 
 
 12
 Appellant argues that the Government's formula distorts income by allocating costs in proportion to fair market value of the interests sold and retained. However, such a method of allocation is in accord with correct accounting practice. Thus, Seidler and Carmichael, ACCOUNTANTS' HANDBOOK, supra, states:
 
 
 13
 The value method [of allocating costs] is most commonly used. Under this method, the allocation of costs is based on relative values, such as estimated sales prices or appraised values.
 
 
 14
 Davidson and Weil, HANDBOOK OF MODERN ACCOUNTING, supra, teaches:
 
 
 15
 The various methods used for this allocation include ... value methods (mortgage release prices, estimated selling prices, or appraisals) ....
 
 
 16
 Morrison and Cooper, FINANCIAL ACCOUNTING (1975), 283, in discussing "basket" purchases, says:
 
 
 17
 A method which is commonly employed to allocate the total acquisition cost to the individual assets involves estimating the current values of the individual assets, and prorating the cost to each asset according to the proportion of its current value to the total current value of all the assets acquired.
 
 
 18
 The value method of allocation was recognized by this court's predecessor in Du Pont de Nemours & Co. v. United States, 471 F.2d 1211, 1220 (Ct.Cl.1973), which describes Welsh Homes, Inc., supra, as an example of cases reaching "satisfactory solutions" in allocating costs between retained and transferred interests. See also Biscayne Bay Island Co., 23 B.T.A. 731, 735 (1931).
 
 
 19
 Appellant further argues that if any reallocation is made, it should be limited to the cost of the amenities constructed on the leased land. However, as found by the Claims Court, the expenditures which the partnership had incurred to improve the interest that was sold (namely the condominium complex and the amenities) also materially enhanced the rentability of the leased interest, which could not have been rented at the rates set but for such expenditures.
 
 
 20
 Therefore, we hold[4] that the Claims Court correctly determined that the cost of the condominium complex and the amenities should be allocated to both the condominium complex and the leased land retained by the partnership, according to their respective values.[5]
 
 
 21
 The dissenting opinion cites "uncontradicted evidence at trial [establishing] that the sale/ground lease arrangement used by the taxpayer was prevalent in the Boca Raton area," but such evidence does not indicate what allocation methods were used in those arrangements and whether or not the Government approved them. Even if they had used an allocation method similar to the one used by Urbanek and it could be shown that this passed muster on audit by the Internal Revenue Service, that would not tie the Government's hands in this case. Mertens, LAW OF FEDERAL INCOME TAXATION (1976; 1983 Supp.) Secs. 6015-6017; see also Carlton's Estate, 298 F.2d 415, 419 (2d Cir.1962). Accordingly, the suggestion that the Government's position here represents a "sweeping change in the taxation of condominium sales" that should emanate only from the Congress is not well taken.
 
 
 22
 Finally, appellant argues that, alternatively, the partnership is entitled to depreciate any construction costs reallocated to the leased land, citing Treas.Reg. Sec. 1.167(a)-4.[6] However, the key phrase in the regulation is "if subject to depreciation allowances," and appellant merely begs the question by his reliance on the regulation. We are satisfied that the Claims Court correctly held that the reallocated costs are not subject to depreciation allowances. As the court pointed out, the condominium complex and amenities merely lend an "intangible benefit" (enhanced rentability) to the leased land and are not a part of it, and it was the partnership that severed ownership of the land from ownership of the improvements, leaving it nothing to depreciate. See F.M. Hubbell Son & Co. v. Burnet, 51 F.2d 644, 645 (8th Cir.1931).[7]
 
 
 23
 In view of the foregoing, the judgment of the Claims Court is affirmed.
 
 
 24
 AFFIRMED.
 
 
 25
 BENNETT, Circuit Judge, dissenting.
 
 
 26
 I respectfully dissent from the majority's holding that the government may reallocate construction costs in accordance with the Welsh Homes formula (which the majority calls the "value method of allocation").
 
 
 27
 * The majority is laboring under the illusion that the main issue in this appeal is the apportionment of costs in accordance with "correct accounting practice"--a theory that no doubt will surprise the parties since no one argued it.[1] The parties and the Claims Court believed that the issue here was whether the Welsh Homes formula should be applied to the peculiar facts of this case under existing tax law.
 
 
 28
 Prior to the Claims Court's and the majority's decisions, it appeared that in the calculation of the cost of goods sold, a taxpayer should allocate to the interest sold the costs associated with that interest. The taxpayer in this case[2] simply allocated the costs of the improvements and the .9-acre parcel of land to the interest sold in fee simple (the condominium towers, the .9-acre tract of land on which the towers were located, and the amenities) and included the cost of the 4.6-acre tract of land in the basis of the retained interest (ground rent on the 4.6-acre tract of land).[3] This allocation has a basis both in common sense and tax law,[4] and serves as an affirmation of the principle that the term "cost of goods sold" means just that.
 
 
 29
 The government, however, was skeptical of such a simple allocation, and initially asserted that the rent charged for the ground lease was excessive, and attempted to invoke a theory whereby the "excess rent" payable under a long-term lease is capitalized and treated as proceeds from the sale of property. Doubtlessly in recognition of the fact that this "capitalization" theory had not been met with judicial favor,[5] the government, in its amended answer in the Claims Court, tested a new theory: the application of the Welsh Homes formula outside the unique area of Maryland ground rents.[6] In Welsh Homes, where property interests in both the building and the underlying land are simultaneously retained and conveyed,[7] and thus the cost of the leasehold interest carved out of the whole "cannot be definitely shown," 279 F.2d at 394 (emphasis added), the court approved the Commissioner's use of an allocation method whereby the costs of the entire interest are lumped together and attributed to the interest sold and the interest retained according to their respective values in the year of sale. Id.
 
 
 30
 The factual disparity between the Maryland ground rent setting and the arrangement utilized by the taxpayer in this case is manifest, and, more important, the sine qua non of the Welsh Homes formula, that costs cannot be traced to the respective property interests, is conspicuously absent from this case.[8] The effect of the application of the Welsh Homes formula to this case is that the plain reality of attributing costs to the interests to which they relate is ignored, and used in its stead is a wholly arbitrary means of allocating costs according to values without any recognition of the substance of the arrangement that the taxpayer utilized. In Frank Lyon Co. v. United States, 435 U.S. 561, 583-84, 98 S.Ct. 1291, 1303, 55 L.Ed.2d 550 (1978), the Supreme Court stated:
 
 
 31
 [W]here ... there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.
 
 
 32
 The government has ignored the Supreme Court's admonition in this case, as the application of the Welsh Homes formula effectively restructures the transaction entered into by the taxpayer by allocating a portion of the cost of the improvements, which were sold in fee simple, to the interest retained by the taxpayer.
 
 II
 
 33
 The accounting texts "judicially noticed" by the majority offer no support for the application of the Welsh Homes formula in this case. In the first place, the proposition put forth in the texts, that costs should be matched with related revenues,[9] is so general as to have no great relevance to the specific facts of this case. At the very least, the proposition that the government's proposed reallocation of costs is in accord with proper accounting practice would have to be established by expert testimony or by an accounting text that specifically addresses the type of arrangement utilized by the taxpayer.
 
 
 34
 Secondly, the texts cited do not support the use of the "value method" of financial accounting in this case. Seidler and Carmichael, ACCOUNTANTS' HANDBOOK (1981), 20-31, "Allocation of Costs," actually suggests that the "accounting method"[10] used by the taxpayer, the direct tracing of costs, should be used.
 
 
 35
 Specific Identification Method. This method of cost allocation is based on determining actual costs applicable to each parcel of land. It rarely is used for land costs because such costs usually encompass more than one parcel. However, it frequently is used for direct construction costs because these costs are directly related to the property being sold. This method should be used wherever practicable.
 
 
 36
 Id. at 20-32 (emphasis added). Davidson and Weil, HANDBOOK OF MODERN ACCOUNTING (1977), 17-14, "Cost Allocation," merely lists four methods of accounting for capitalized costs, including the specific identification method, without any statement suggesting which method is most appropriate to the facts of this case. Finally, Morrison and Cooper, FINANCIAL ACCOUNTING (1975), 283, describes a "basket" purchase as follows:
 
 
 37
 It occasionally happens that a firm acquires several assets all for one price with what is called a "basket" purchase. In this situation, the total cost of the several assets is known but the distribution of the cost to the individual assets may be uncertain. [Emphasis in original.]
 
 
 38
 The relevance of an allocation method based on "basket" purchases to the facts of this case escapes me.[11]
 
 III
 
 39
 The majority elevates the Claims Court's legal conclusion that the taxpayer's allocation of costs "does not reflect reality ..." to a finding of fact subject to the "clearly erroneous" standard of review. This legal conclusion was based, in turn, on the court's perception that the taxpayer was free to manipulate the condominium price and ground rent in any proportion, 2 Cl.Ct. at 577, a proposition rejected in Murry v. Commissioner, 601 F.2d 892, 898 (5th Cir.1979), and Friedman v. Commissioner, 36 T.C.M. (CCH) 841, 850-51 (1977), because an inequitable balance of purchase price to rental payments would result in the reduction of the attractiveness of the offering to the public.[12] The uncontradicted evidence at trial established that the sale/ground lease arrangement used by the taxpayer was prevalent in the Boca Raton area, and that the independent (i.e., nontax) business purpose of the arrangement was to lower the purchase price of the condominium units and thereby facilitate their sale.
 
 IV
 
 40
 In short, I would reverse and leave the taxpayer's allocation of costs intact, rather than substitute a means of taxation that is based more on the government's imagination than the economic substance of the transaction. The application of the Welsh Homes formula to this case is clearly unwarranted under existing tax law. Such a sweeping change in the taxation of condominium sales should come, if at all, from Congress, and not from "creative" judicial opinions. See United States v. Byrum, 408 U.S. 125, 135, 92 S.Ct. 2382, 2389, 33 L.Ed.2d 238 (1972).
 
 
 
 [1]
 Urbanek's share of the asserted additional income was $270,158
 
 
 [2]
 The Claims Court remarked: "Of course, since the taxpayer sold the 4.6 acres in a later tax year, he was entitled to add those [reallocated] costs to his basis in the land and thereby lower his gain from that sale."
 
 
 [3]
 We take judicial notice of authoritative texts cited herein. Werk v. Parker, 249 U.S. 130, 132-33, 39 S.Ct. 197, 198, 63 L.Ed. 514 (1919); Nippon Kogaku (USA), Inc. v. United States, 673 F.2d 380, 382 (CCPA 1982); Schott Optical Glass, Inc. v. United States, 612 F.2d 1283, 1285, 67 CCPA 32 (1979); In re Moureu, 345 F.2d 595, 597 n. 4, 52 CCPA 1363 (1965); In re Hartop and Brandes, 311 F.2d 249, 253, 50 CCPA 780 (1962); In re Eisenhut, 245 F.2d 481, 483 n. 2, 44 CCPA 974 (1957)
 
 
 [4]
 The dissenting opinion misstates the holding, which is premised on basic tax law and not on the circumstances of Maryland ground rent law, which was involved in Welsh Homes
 
 
 [5]
 The Claims Court explained that, under its method, the sales price of the units is divided by the aggregate value of the entire property, which consists of the sales price plus the value of the lease (i.e., the capitalized value of the lease, which the court determined to be nine times the annual rent to be received from the owners of the 108 units sold in 1972). The parties have apparently agreed to the following computation if the value method for allocation is held to be applicable:
 COMPUTATION OF "COST OF CONDOMINIUMS SOLD"
-----------------------------------------------------------
PER CLAIMS COURT RULING
-----------------------
Value of Interest Sold (Sales per return) $ 3,559,050.00
Value of Interest Retained
 $63,180 annualized rentals x 9 $ 568,620.00
 --------------
Aggregate Value of Interests Sold and
 Retained $ 4,127,670.00
Ratio of Interest Sold to Aggregate Value =
 $3,559,050.00 = .8622418
 -------------
 $4,127,670.00
Cost of Improvements $ 2,931,710.79
Cost of Land $ 197,314.83
 $496,941.06 x 108
 ---
 272 --------------
Aggregate Costs $ 3,129,025.62
Multiply by Ratio of Value of Interest Sold
 to Aggregate Value .8622418
 --------------
Cost of Goods Sold Per Court's Opinion $ 2,697,976.00
Cost of Goods Sold Per Return $ 3,030,368.00
Cost of Good(s) Sold Per Court $ 2,697,976.60
 --------------
Adjustment of Partnership Return $ 332,391.40
Multiplied by Plaintiffs' Interest .50 .50
 --------------
 Plaintiffs' Share of Adjustment $ 166,195.70
 
 
 [6]
 The regulation provides in pertinent part:
 Capital expenditures made by a lessor for the erection of buildings or other improvements shall, if subject to depreciation allowances, be recovered by him over the estimated life of the improvements without regard to the period of the lease. [Emphasis added.]
 
 
 [7]
 Like the Claims Court, "Insofar as D. Loveman & Son Export Corp. v. Commissioner, 34 T.C. 776, 806-08 (1960), aff'd 296 F.2d 732 (6th Cir. [1961], cert. denied 369 U.S. 860, 82 S.Ct. 950, 8 L.Ed.2d 18 (1962), may be read as suggesting that a taxpayer can depreciate an asset he does not own, the court is unpersuaded and declines to follow."
 
 
 [1]
 It is perplexing to note that the majority places great emphasis on its notion that the application of the Welsh Homes formula in this case is in accord with "correct [financial] accounting practice." In Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979), the Supreme Court cautioned against even the presumption of equivalency between tax and financial accounting, given their disparity of purpose. See discussion id. at 538-44, 99 S.Ct. at 784-87; see also Frank Lyon Co. v. United States, 435 U.S. 561, 577, 98 S.Ct. 1291, 1300, 55 L.Ed.2d 550 (1978); Commissioner v. Idaho Power Co., 418 U.S. 1, 15, 94 S.Ct. 2757, 2765, 41 L.Ed.2d 535 (1974); American Automobile Assn. v. United States, 367 U.S. 687, 693, 81 S.Ct. 1727, 1730, 6 L.Ed.2d 1109 (1961); United Grocers, Ltd. v. United States, 308 F.2d 634, 641 (9th Cir.1962) ("[w]hile testimony relative to accepted accounting practice may properly be considered by the court, it is not conclusive in determining the legal tax consequences of any transaction")
 
 
 [2]
 For the sake of simplicity, the actions of the partnership will be referred to as the "taxpayer."
 
 
 [3]
 The government does not challenge the allocation of the cost of the 5.5-acre tract between the .9-acre lot sold and the 4.6-acre lot retained. See Treas.Reg. Sec. 1.61-6(a) (1982)
 
 
 [4]
 With all due respect to the observation in Skoglund v. United States, 230 Ct.Cl. 833, 834 (1982), that "[u]nfortunately, common sense and tax law are rarely even waving acquaintances."
 
 
 [5]
 See, e.g., Murry v. Commissioner, 601 F.2d 892, 893 (5th Cir.1979); Mangurian v. Commissioner, 38 T.C.M. (CCH) 366, 375 (1979); Friedman v. Commissioner, 36 T.C.M. 841, 851 (1977); Welsh Homes, Inc. v. Commissioner, 32 T.C. 239, 250-52 (1959), aff'd, 279 F.2d 391 (4th Cir.1960)
 
 
 [6]
 In only one case has the Welsh Homes formula been applied outside this area, Connolly v. Commissioner, 34 T.C.M. 1379 (1975). In Connolly, the taxpayer constructed a cooperative apartment building on a parcel of land. The parties stipulated that the taxpayer "sold" leasehold interests in both the land and the building to cooperative apartment purchasers. Id. at 1381-82. Thus, the arrangement utilized in Connolly resembled that used in the Maryland ground rent setting where the building and its underlying land are both sold and leased. Moreover, the court in Connolly cautioned that "our disposition of this case can hardly have any useful precedential value in other cases where the matters in controversy are more sharply brought into focus against the background of a more clearly developed record." Id. at 1385
 
 
 [7]
 See Welsh Homes, 279 F.2d at 393-94, for a description of the intricacies of the Maryland ground rent arrangement
 
 
 [8]
 In Welsh Homes, the court stated:
 The cost of the land and the cost of the building, the constituent elements of the property which the builder has acquired are known, but in the building operation they have been incorporated into a single property and when a part interest in the whole--the leasehold--is granted to the lessee and the reversionary interest or ground rent is retained by the lessor, it is impossible to ascertain what part of the value of these interests is attributable to the land and what part to the building. It follows that the cost of land and buildings must be allocated between the interest granted and the interest retained.
 279 F.2d at 395. Welsh Homes thus involves a situation where the same property is both leased and sold. In this case the sale and lease each related to different, easily discernible properties, so there is no difficulty in tracing costs to the interest to which they relate.
 
 
 [9]
 Assuming relevance, under this general rule the taxpayer's allocation of costs was "correct," as the costs of the properties sold were matched with sales income, and the cost of the parcel retained was included in the basis of the rental interest
 
 
 [10]
 The issue in this case is whether Welsh Homes should be applied, not the taxpayer's choice of an "accounting method" for a one-time deduction of costs
 
 
 [11]
 In Welsh Homes, 279 F.2d at 395, the court was describing a "basket" purchase when it stated that "[a]llocation of costs is normally employed for the establishment of a cost basis of property when a taxpayer acquires an aggregate of assets for a single unallocated purchase price and subsequently sells a portion of the whole." (Citation omitted.) The court then noted that the case before it "presents the reverse of the situation," because the costs are known but it is impossible to trace these costs to the interest sold and the interest retained. Id. As previously mentioned, there is no difficulty in this case in assigning costs to the interest to which they relate, and thus Welsh Homes is inapplicable. See supra note 8
 
 
 [12]
 If, for example, the taxpayer offered the condominium units with a low purchase price (immediate gain to the taxpayer) and a correspondingly high rental payment (deferred income), one of the main tax advantages to the purchaser, deduction of interest payments, would be largely lost, as it is generally known that no deduction is permitted for nonbusiness rent